609 A.2d 329

**Linda Gayle MATTINGLY, et vir,**

v.

**Kenneth W. SHIFFLETT.**

**No. 74, Sept. Term, 1991.**

Court of Appeals of Maryland.

July 23, 1992.

**338**

Ross A. Albert, argued and on brief (Karen L. Barr, James Robertson, Wilmer, Cutler & Pickering, on brief), Washington, D.C., for appellant.

John Dowling, Rober Teir, Washington, D.C., for the American Alliance for Rights and Responsibilities, amicus curiae.

Barry J. Rosenthal, argued and on brief (Bromberg & Rosenthal, on brief), Rockville, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

In August of 1989, Linda and Tom Mattingly married and moved into a Gaithersburg apartment. The Mattingly household included two children: Raymond B. Stoute, now 8 years old (the son of Linda's first husband); and Thomas V.K. Mattingly, now 5 years old. Within two months of the marriage, Linda Mattingly began a sexual relationship with Kenneth Shifflett, who lived in the apartment next door to the Mattinglys. Mrs. Mattingly admits that she and Mr. Shifflett had a sexual relationship lasting at least from the middle of November through late December of 1989.

Throughout the time of her affair with Mr. Shifflett, Mrs. Mattingly states that she continuously cohabited and had regular sexual relations with her husband. In December of 1989, she learned that she was pregnant. Following this discovery, Mrs. Mattingly wrote a series of letters to Mr. Shifflett in which she proclaimed her deep and eternal love for him and acknowledged that he was the father of the child she was carrying. She also expressed her desire to raise a family with Mr. Shifflett. Mrs. Mattingly says that one month later she came to realize that she "had made a terrible mistake by entering into a romantic relationship with Mr. Shifflett" and that she loved her husband and children and wanted very much for the Mattingly family to stay intact. Mrs. Mattingly states that she then told Mr. Shifflett that she wanted to end their relationship and that he became upset and tried to persuade her to change her mind. Failing in these attempts, Mr. Shifflett allegedly began a campaign of intimidation and harassment consisting of telephone threats, battery, and trespass. The Mattinglys filed a series of criminal charges against Mr. Shifflett dating from February through September, 1990. Despite acknowledging that these charges were filed by the Mattinglys, Mr. Shifflett contends that his affair with Mrs. Mattingly lasted through July of 1990.

On September 6, 1990, while Linda Mattingly was still pregnant, Mr. Shifflett filed a pro se "Complaint to Establish Paternity." He named as defendants both Linda Mattingly and Thomas Mattingly and acknowledged that the Mattinglys are husband and wife. The Mattinglys contend that the action was yet another maneuver in Mr. Shifflett's continuing harassment campaign. Apparently the State's Attorney refused to consent to Mr. Shifflett's paternity action so he filed a "Motion to Allow Paternity Complaint Without Consent of State's Attorney" pursuant to Maryland Code (1984, 1991 Repl.Vol.), Family Law Article, § 5–1010(g)(2). An order granting that motion was subsequently signed by the court. The day after Mr. Shifflett filed his paternity complaint Linda Mattingly gave birth to a baby

girl, who was named Jaclyn. Tom Mattingly was listed as the father on Jaclyn's birth certificate, and at all times he apparently has freely acknowledged Jaclyn as his own natural child. Approximately one month after filing his original complaint, Mr. Shifflett retained counsel through whom he filed a motion for blood tests of Mrs. Mattingly, Mr. Mattingly, Jaclyn, and himself. As authority for the tests, he cited Md.Code (1984, 1991 Repl. Vol.), Family Law Art. § 5–1029, which provides in relevant part:

> "(a) *In general.*—On the motion of a party to the proceeding or on its own motion, the court *shall order the mother, child, and alleged father* to submit to blood tests to determine whether the alleged father can be excluded as being the father of the child." (Emphasis added.)

Mr. Shifflett did not suggest how that section can be used as authority to order a blood test of Mr. Mattingly. Recognizing the presumption of legitimacy embodied in § 5–1028(c)(1), which states that "[t]here is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception," Mr. Shifflett simply contended in his motion that his "ability to overcome the rebuttable presumption that ... Thomas Mattingly is the father of the child will require evidence which can only be obtained from a blood test of the parties hereto and the minor child."

Mr. and Mrs. Mattingly jointly filed a motion to dismiss Mr. Shifflett's complaint and, in the alternative, a motion for summary judgment. On the same day, the Mattinglys also filed a response to Mr. Shifflett's motion for blood tests. In both of these pleadings, the Mattinglys asserted that the facts pled by Mr. Shifflett failed to rebut the presumption of legitimacy in § 5–1028 and consequently Mr. Shifflett could not request blood tests under § 5–1029. The Mattinglys concluded that under the statute Mr. Shifflett had failed to state a claim upon which relief could be granted. Likewise, in their response to Mr. Shifflett's motion for blood tests, the Mattinglys argued that court-

ordered "[b]lood tests would be premature and grossly intrusive unless and until the presumption described above can be rebutted." In each pleading the Mattinglys also argued that Mr. Shifflett lacked standing to establish paternity as contemplated under Title 5, Subtitle 10 of the Family Law Article (hereinafter referred to collectively as "the paternity statute").

Judge Vincent Ferretti, Jr., sitting in the Circuit Court for Montgomery County, heard argument on the parties' motions. Judge Ferretti denied the Mattinglys' motion to dismiss because he was not convinced that Mr. Shifflett was foreclosed from using the mandatory blood tests to rebut the presumption of legitimacy.[1] Referring to Mr. Shifflett's request for blood tests, Judge Ferretti observed:

"Before the mother or her husband would be competent to testify there would have to be a preliminary finding by the court that some evidence rebutted the presumption. Right now we are not even at that stage. We are just in the search for evidence."

The parties debated, and the court pondered, over the proper procedure to rebut the legitimacy presumption codified in § 5–1028 of the Family Law Article. The statute provides:

"(a) *Burden of proof.*—At the trial, the burden is on the complainant to establish by a preponderance of the evidence that the alleged father is the father of the child.

(b) *Competency to testify.*—Both the mother and the alleged father are competent to testify at the trial.

(c) *Presumption.*—(1) There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception.

(2) The presumption set forth in this subsection may be rebutted by the testimony of a person other than the mother or her husband.

---

1. Judge Ferretti also denied the Mattinglys' motion for summary judgment, finding that there was a factual dispute as to "who the father of the child is."

(3) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, it is not necessary to establish nonaccess of the husband to rebut the presumption set forth in this subsection.

(4) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, both the mother and her husband are competent to testify as to the nonaccess of the husband at the time of conception.

(d) *Compelling alleged father to give evidence.*—The alleged father may not be compelled to give evidence at the trial."

While heeding the Mattinglys' last argument that the court should not order blood tests until they were given an opportunity to file an answer to the complaint, Judge Ferretti instructed counsel for the Mattinglys that they could admit or deny Mr. Shifflett's paternity in their answer. The judge further instructed the Mattinglys that should they deny it, he would then order all parties to submit to blood tests. In so ruling, it appears that Judge Ferretti dismissed the Mattinglys' earlier argument that questioned whether the blood tests could be performed for the purpose of rebutting the legitimacy presumption. Ostensibly, the judge ruled that the blood tests could be conducted, and the results admitted, for the purpose of rebutting the presumption of legitimacy in § 5–1028.

The Mattinglys then filed an answer generally denying Mr. Shifflett's paternity, and Judge Ferretti ordered the parties and the minor child to submit to HLA and DNA blood tests to determine paternity. Following Mr. and Mrs. Mattingly's failure to comply with this order, they were both found in contempt and allowed to purge their contempt by submitting to the blood tests. By March of 1991, all parties had submitted to blood tests establishing to a 99.-86% probability that Mr. Shifflett is Jaclyn's biological father. The blood tests also excluded Mr. Mattingly as the

father. Following the results of the blood tests, Mr. Shifflett again amended his complaint to include a second count seeking custody and, prior to the determination of custody, visitation with Jaclyn. Mr. Shifflett then filed a motion for partial summary judgment on the issue of paternity. Judge William C. Miller, sitting in the Circuit Court for Montgomery County, found that the presumption had been

"overwhelmingly overcome by a blood test that shows a 99.86 percent [probability] that Mr. Shifflett is the father, by admissions, an[d] affidavit[s] shown. The only opposition is basically that the Mattinglys were married and living together at the time of conception. In the court's opinion that is not enough to create a genuine dispute as to fact."

Consequently at the conclusion of the May 3, 1991 hearing, Judge Miller issued an oral order granting partial summary judgment on the issue of paternity and declaring Mr. Shifflett to be Jaclyn's father. Ten days later, the court ordered that the matter of visitation be reset for a hearing before a Domestic Relations Master and that Mr. Shifflett be allowed to visit Jaclyn in the interim.[2] The Mattinglys appealed the circuit court's May 3rd order granting partial summary judgment on the issue of paternity. Prior to the decision of the Court of Special Appeals, we issued a writ of certiorari.

We shall not review the issues raised in the circuit court because the court's May 3rd order granting partial summary judgment was not a final judgment. Under Maryland Rule 2–602, an order "that adjudicates fewer than all of the claims in an action . . . is not a final judgment. . . ." Clearly, the order granting partial summary judgment left unresolved the primary purpose of Mr. Shifflett's amended complaint: his attempt to secure visitation or custody. Be-

---

2. Pursuant to subsequent recommendations of the Domestic Relations Master, a pendente lite order was entered granting Mr. Shifflett visitation privileges prior to a hearing on the issue of custody. This pendente lite order was filed on June 21, 1991, roughly three weeks after the Mattinglys filed their notice of appeal.

cause an appeal will lie only from a final judgment entered by the circuit court, the Mattinglys' appeal was premature. *See Adams v. Mallory,* 308 Md. 453, 461–63, 520 A.2d 371, 376 (1987) (An order determining paternity was not a final judgment for purposes of appeal where order reserved judgment on remaining issues of child support and visitation). Consequently, we dismiss the appeal.

APPEAL DISMISSED. COSTS TO BE PAID BY APPELLANTS.