621 A.2d 898

Patricia Thomas MONROE

v.

Donald P. MONROE.

No. 114, Sept. Term, 1991.

Court of Appeals of Maryland.

March 26, 1993.

No argument on behalf of petitioner.

Ann M. Turnbull (Joseph J. Wase, Turnbull, Wase & Lyons, P.A., all on brief), Towson, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

The propriety of a trial court's order, entered at the mother's behest, that the man who acknowledges paternity of a child born out of wedlock take a blood test to establish that paternity, is one of the issues presented in this case. The related issue, whether the results of the blood test properly were admitted into evidence and deemed to be dispositive of the acknowledged father's custody claim, is also presented. Holding that it was reversible error to require the acknowledged father to submit to a blood test, the Court of Special Appeals reversed the judgment of the Circuit Court for Baltimore County, which had upheld a master in chancery's admission of blood test results, excluding the acknowledged father as the biological father, into evidence and, on the basis of that evidence, transferred custody of the child from the acknowledged father to her mother. *Monroe v. Monroe*, 88 Md.App. 132, 594 A.2d 577 (1991). We granted the petition for certiorari filed by Patricia Thomas Monroe, the petitioner, in order that we might consider the important issues this case presents.

## I.

After they had been dating for a short time, the petitioner informed Donald P. Monroe, the respondent, that she was pregnant with his child. Skeptical, due to his having a low sperm count, the respondent requested that the petitioner take a "voice stress analysis test," which she did. The results of the test "proved" that the petitioner believed that the respondent was the father of the expected baby. Thereafter, when the baby, Beth, was born, the respondent was present in the delivery room and his name was placed on the

birth certificate as the father. After about two and a half years, during which the parties and Beth lived together, the parties were married.

Within months after the marriage, following an argument, the petitioner told the respondent that he was not Beth's father. They separated. When the petitioner filed a complaint for absolute divorce, the respondent, answering it, filed a Motion For Order Requiring Blood Tests, accompanied by an affidavit. In the motion, and affidavit, the respondent denied being Beth's natural father, explaining that when Beth was conceived, he and the petitioner were not living together and the petitioner was having sexual relations with another man. The respondent also asserted that he would "continue to have doubts concerning this matter if I were found to be the father of the said Minor Child just because I am married to the Plaintiff, the child's mother." The parties reconciled before blood tests were ordered, or taken, and the matter was not further pursued.

The parties separated for the final time in 1989. Pursuant to a Voluntary Separation and Property Settlement Agreement, they agreed to joint custody of the child "born to the parties prior to their marriage," that the primary residence of the child would be the petitioner's, and that the respondent would have visitation rights. The agreement also provided that neither party would move from the State of Maryland with Beth without the express consent of the other. The agreement was amended to provide for automatic increases in child support, to make the respondent responsible for the payment of private school tuition, and to require the parties to share the costs of college. It was also amended to make clear that reconciliation would not affect the child support, visitation, custody or property disposition provisions.

The parties also entered into two consent orders. The first, entered into shortly after the separation agreement was signed, confirmed the support, joint custody and visitation arrangements reflected in the agreement, provided for the petitioner and child to reside in the marital home, and

required the child to resume attendance at private school. In addition to providing for increased support and other expenses for the child, the second consent agreement called for the psychological and psychiatric examination of the parties and Beth to facilitate recommendations as to custody and visitation.

When the petitioner moved, with Beth, from the State of Maryland, the respondent filed a motion for temporary and exclusive custody, which the circuit court granted. Following an emergency hearing, that order was continued in effect, pending an evidentiary hearing. Before the evidentiary hearing could be held, however, the petitioner filed a Motion To Order Blood Tests To Establish Paternity, alleging that the respondent was not Beth's biological father. The court granted the motion, ordering the respondent to submit to a blood test, which he ultimately did. The results of the test excluded him as Beth's biological father.

The evidentiary hearing proceeded as scheduled and the blood tests results were admitted into evidence over the respondent's objection. Following testimony by both parties, as well as from numerous witnesses called on their behalf, and, notwithstanding the blood test results, the master recommended, *inter alia*, that temporary custody be continued in the respondent.

Both parties excepted to the master's recommendations. The petitioner excepted to the temporary custody recommendation and the respondent to the admission into evidence of the blood test results. The court sustained the petitioner's exceptions and overruled the respondent's. Consequently, it ordered that temporary custody of Beth be changed from the respondent to the petitioner.[1] Adopting the master's findings that neither party was unfit, the court rejected those pertaining to the existence of exceptional circumstances sufficient to overcome the presumption that

---

1. Despite the court's order, custody has not been changed. The order was stayed, first by another judge of the Circuit Court for Baltimore County and, ultimately, by the Court of Special Appeals.

it was in Beth's best interest to be in the custody of the petitioner, a biological parent, rather than the respondent, a "third" party. It found, "as a matter of law," that exceptional circumstances did not exist.

## II.

Our opinion in *Turner v. Whisted*, 327 Md. 106, 111, 607 A.2d 935, 937 (1992) addressed the question:

> Whether a male individual who claims to be the father of a child born to a married couple is entitled to petition a circuit court for a blood test to determine paternity for the purpose of determining whether said male individual is the biological father of the child when the child was conceived prior to the marriage of said married couple.

The motion for blood tests filed in that case was premised on Maryland Code (1974, 1991 Repl.Vol.), § 1–208 of the Estates and Trusts Article and *Thomas v. Solis*, 263 Md. 536, 283 A.2d 777 (1971). We held, in *Turner*, "that § 1–208 of the Estates & Trusts Article provides an alternate avenue by which one could seek blood tests for the purpose of establishing paternity." 327 Md. at 113, 607 A.2d at 938. For that conclusion, we relied on *Thomas*, which held that compliance with § 1–208 was sufficient to protect an unwed father's visitation rights and right to notice of a proposed adoption. *Thomas*, 263 Md. at 544–45, 283 A.2d at 781–82. In addition, we noted the interrelationship between the paternity statute, *see* Maryland Code (1984, 1991 Repl.Vol.), § 5–1001, *et. seq.* of the Family Law Article and § 1–208, which was recognized in *Taxiera v. Malkus*, 320 Md. 471, 578 A.2d 761 (1990). *See also* § 5–1005(a) of the Family Law Article ("An equity court may determine the legitimacy of a child pursuant to § 1–208 of the Estates and Trusts Article."), and § 1–208(b)(1) (the child is legitimate if his or her father "[h]as been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings"). Thus, we held:

> [I]n those cases where two men each acknowledge paternity of the same child, we believe that an action to

establish paternity is more appropriately brought under the Estates and Trusts Article. As advanced by this Court in *Thomas* and *Dawson* [*v. Eversberg*, 257 Md. 308, 262 A.2d 729 (1970)], the Estates & Trusts Article presents the "more satisfactory" and "less traumatic" means of establishing paternity.

327 Md. at 113, 607 A.2d at 938 (quoting *Thomas*, 263 Md. at 544, 283 A.2d at 781; *Dawson*, 257 Md. at 314, 262 A.2d at 732).

Section 1–208 is the preferred mechanism, we explained, because of the discretion it affords the trial court to grant or deny the request for blood tests.[2] Under § 1–208, we

---

**2.** We had no occasion in *Turner v. Whisted*, 327 Md. 106, 607 A.2d 935 (1992) to address the consequences of proceeding under Title 5, subtitle 10 of the Family Law Article. That issue was presented in *Mattingly v. Shifflett*, 327 Md. 337, 341, 609 A.2d 329, 331 (1992). Squarely presented in that case was the proper procedure for rebutting the presumption of legitimacy contained in Maryland Code (1984, 1991 Repl.Vol.), § 5–1028(c) of the Family Law Article. That section, in pertinent part, provides:

> (c) *Presumption.*—(1) There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception. (2) The presumption set forth in the subsection may be rebutted by the testimony of a person other than the mother or her husband. (3) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, it is not necessary to establish nonaccess of the husband to rebut the presumption set forth in this subsection. (4) If the court determines that the presumption set forth in this subsection has been rebutted by testimony of a person other than the mother or her husband, both the mother and her husband are competent to testify as to the nonaccess of the husband at the time of conception.

Shifflett, with whom Mrs. Mattingly had had a sexual relationship, at or about the time that her child was conceived, filed a complaint to establish paternity, naming both Mrs. Mattingly and her husband as defendants. Notwithstanding that Mr. Mattingly was listed as the father on the birth certificate and freely acknowledged the child as his own, Shifflett moved for blood tests of the Mattingly's, the minor child and himself, offering as authority § 5–1029(a) of the Family Law Article, which provides:

> (a) *In general.*—On the motion of a party to the proceeding or on its own motion, the court shall order the mother, child, and *alleged* father to submit to blood tests to determine whether the

pointed out, "[a] motion for blood tests . . . is best analyzed as a request for a physical examination under Maryland Rule 2–423." *Turner,* 327 Md. at 113, 607 A.2d at 939. Pursuant to that rule, good cause must be shown for the order of the blood tests, *id.* at 114, 607 A.2d at 939, the determination of which "allows the court discretion to consider the best interests of the child." *Id.* at 116, 607 A.2d at 940. Whether the presumption of legitimacy, which attaches to a child by virtue of his or her mother's marriage to a man who was married to the mother at the time of conception, and who also acknowledges the child as his, should be rebutted, involves and, indeed, requires the balancing of various interests relevant to the determination of good cause for the blood tests—those of the family unit, those of the man challenging paternity and, most importantly of all, the best interests of the child. Proceeding pursuant to § 1–208 permits these interests to be balanced and, in addition, allows for input from a representative for the child. *Id.* The court need not, and probably should not, rely on the parties to the action accurately and adequately to define what is in the child's best interest.

The case was remanded to the trial court for further proceedings, specifically, for the consideration of the child's best interest prior to the passage of an order requiring

*alleged* father can be excluded as being the father of the child. (emphasis added).

Although recognizing the existence of a rebuttable presumption of paternity, the court ruled that the blood tests could be used to rebut the presumption. By so ruling, the court answered the procedural question: Whether, when, in an action to establish paternity pursuant to the Family Law Article, the presumptive father and the mother denies the putative father's paternity, blood tests should be ordered for their effect in determining the accuracy of the paternity presumption? Unfortunately, the court's order of blood tests, which resulted in excluding the presumptive father as the child's natural father, and the subsequent grant of partial summary judgment declaring the putative father to be the natural father did not result in a final judgment. Left unresolved were the issues primarily presented by the paternity action, namely, visitation and custody. Accordingly, we dismissed the case as constituting an appeal from a non-final judgment. *Shifflett* is not, therefore, of any precedential value.

blood tests. By way of guidance to the trial court, we offered examples of what might constitute criteria for determining the child's best interest when paternity is disputed: "the stability of the child's current home environment, whether there is an ongoing family unit, and the child's physical, mental, and emotional needs." *Id.* We also mentioned the child's past relationship with the putative father and the importance to the child of having available genetic information for medical treatment and genealogical history, as other relevant and important issues. *Id.*

## III.

### A.

█ Rather than being sought in an action to establish paternity, whether pursuant to § 5–1028 of the Family Law Article or § 1–208 of the Estates and Trusts Article, the blood tests in this case are being requested in the context of a child custody dispute between the mother of a child born out of wedlock and the man who has, both before and after their marriage, acknowledged that child as his own and maintained a fatherly relationship with her. Moreover, the purpose for which they are sought is the effect the results will have on the determination of which party should be the child's custodian; the petitioner does not propose to establish who the biological father actually is. Indeed, the petitioner has made it quite clear that she does not know whether the child's biological father is living or dead and, if living, where he is. The petitioner quite candidly acknowledges that, if successful, she will seek no support from the biological father, nor will she attempt to foster a relationship between him and the child. She proffers only that the respondent is not Beth's father and, consequently, should not be her custodian. The desired effect of ordering the blood tests, then, was the disestablishment of the respondent's paternity, not the establishment, concomitantly or otherwise, of paternity in someone else.

■ Maryland Rule 2–423 permits a court to order, on good cause shown, a mental or physical examination of a party or of a person in the custody or under the legal control of a party when the mental or physical condition or characteristic of that party or person in the party's custody or legal control is in controversy. The petitioner's request for blood tests must be analyzed in this context. As a threshold determination, the petitioner must show good cause. It is appropriate for a court to consider the best interest of the child in assessing whether good cause has been shown. *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992). If it would not be in the child's best interest to have the blood tests reveal that a man who has been the *de facto* father in the whole of the child's life is not the biological father, surely the circuit court should consider that probability in the exercise of its discretion under the good cause standard. That assessment may only be made by considering the entirety of the relationship between the child, the petitioner and the respondent.

### B.

■ Neither the paternity statute nor § 1–208 is directly implicated in this case—establishing paternity is not a necessary factor to be considered when addressing the issue of custody. The policies and purposes underlying those statutes are, nevertheless, relevant to the determination whether good cause for ordering the blood tests has been shown.

Both the paternity statute [3] and § 1–208 are aimed at the legitimation of children born out of wedlock.[4] Indeed, to secure for children born out of wedlock, "as nearly as practicable, the same rights to support, care, and education as children born in wedlock," *Taxiera,* 320 Md. at 479, 578 A.2d at 765, is their paramount goal.

---

**3.** To the extent that the paternity statute seeks to establish who the legitimate father of a child born out of wedlock is, it, too, is a legitimation statute.

**4.** *See* § 5–1002(b) of the Family Law Article.

## C.

█ The purpose of legitimation statutes is well served, and, in fact, furthered when, without court proceedings, a child born out of wedlock is legitimated. It matters not whether the result was accomplished pursuant to § 1–208(b)(2), (3), and (4) or pursuant to § 5–1029. Thus, where the party against whom the paternity decree is sought, *see Skeens v. Paterno,* 60 Md.App. 48, 58, 480 A.2d 820, 825 (1984), or as to whom the determination of paternity would be adverse, *see Harvey v. Williams,* 319 Md. 238, 246, 572 A.2d 149, 153 (1990), admits paternity, no further judicial proceedings to establish that fact are required. A putative father's admissions, in pleadings, to being the child's father obviate the need for a judicial filiation decree,[5] as a prerequisite to his seeking custody of, or visitation with, the child whose paternity he admitted. *Thomas,* 263 Md. at 544, 283 A.2d at 781; *Skeens,* 60 Md.App. at 58, 480 A.2d at 825. Particularly is the purpose of the legitimation statutes served when, in addition to acknowledging paternity, as, for example, in the manner prescribed in § 1–208, the acknowledged father undertakes, without the necessity of a court order, the basic obligations and responsibilities of parenthood—he maintains a fatherly relationship with the child and provides for its support and care.

## D.

In the case *sub judice,* Beth was conceived before her mother married the respondent. Therefore, the respondent is not, presumptively, Beth's father. On the other hand, from the time that he was satisfied that he was, as the petitioner advised him, her father, the respondent has acted accordingly. He consented to his name being placed on the birth certificate, he has openly and notoriously acknowledged Beth as his daughter, he has acknowledged paternity

---

5. A filiation decree is one in which the court declares the paternity of a child born out of wedlock. *Skeens v. Paterno,* 60 Md.App. 48, 55, 480 A.2d 820, 823 (1984). *See, e.g.,* § 5–1032.

in writing, *i.e.*, in the separation agreement he and the petitioner executed, and he married Beth's mother. Thus, he acknowledged his paternity of Beth in three of the four ways enumerated in § 1–208.[6]

## IV.

When a court is called upon to resolve the issue of which of the parties to a child custody action should be awarded custody of a child, the critical and overriding consideration is "what is in the best interest of the child?" *McCready v. McCready*, 323 Md. 476, 481, 593 A.2d 1128, 1130 (1991); *Taylor v. Taylor*, 306 Md. 290, 303, 508 A.2d 964, 970 (1986). *See also Ross v. Hoffman*, 280 Md. 172, 175 n. 1, 372 A.2d 582, 585 n. 1 (1977). It is not simply one of several factors; rather, it is "the objective to which virtually all other factors speak." *Taylor*, 306 Md. at 303, 508 A.2d at 970 (1986). That standard permeates the entire proceedings, not simply the bottom line determination of in whose custody the child should be placed. This does not mean, of course, that every bit of evidence sought to be introduced in a child custody case must be assessed, before its admission, in light of the child's best interest. It does mean, however, that when information which potentially undermines the best interest of the child, as well as the interest sought to be protected by the legitimation statutes, and the policy of this State, it must first be tested in light of that standard. That is precisely what we held in *Turner*, *albeit* in the context of contested paternity proceedings. *Turner*, 327 Md. at 117, 607 A.2d at 940.

The evidence in this case is that, from Beth's birth, and arguably before, the respondent has, far from simply ac-

---

**6.** Because, in this case, the respondent complied with three of the four methods prescribed, whether the disjunctive factors are of co-equal importance in establishing the man's paternity of a child is a matter that we need not and, therefore, do not address.

knowledging paternity, been Beth's father.[7] In fact, as far as the record reflects, he is the only father she has known. There is also evidence in the record that Beth regards the respondent as her father. Notwithstanding that, for a part of the period, it was without benefit of marriage, the respondent has lived with Beth and her mother, as a family unit, since her birth.

Curiously, in the motion requesting blood tests, the petitioner indicated prior reluctance "to reveal that the plaintiff was not the child's father because the defendant did not wish to harm the child." In the affidavit accompanying the motion, while acknowledging that she previously had confirmed to the respondent that he was, the petitioner swore that blood tests are necessary because the respondent "is not the natural father of my child." Although she admitted that, at one time, she "believed that it was in my child's best interest that [the respondent] act as the natural father so as to give continuity and structure to her life ..., since [the respondent] is seeking custody at this time, it has become necessary for me to make this information known at this time." The petitioner also alleged that the respondent knew that he was not the child's natural father and had, on previous occasions, denied paternity.

From the motion, and the accompanying affidavit, clearly, the only basis for requesting blood tests is the petitioner's desire to prove that the respondent is not Beth's biological father. Indeed, her motion for blood tests is explicit in that regard. From the motion and affidavits it may also be inferred that the petitioner *now* believes that Beth's best interest lies in her being in the petitioner's sole custody, which requires the termination of the relationship, as it has

---

7. Where a man provides support and care to a child believing, as a result of the mother's representations, that he is the child's father and, thereafter, after being told and, indeed, efforts have been made to prove that he is not, he continues to insist that he is, it is quite likely that he will be deemed to be equitably estopped to deny his obligation to continue to provide for the care and support for the child. *See Knill v. Knill,* 306 Md. 527, 536–37, 510 A.2d 546, 551 (1986).

developed, between the child and the respondent. As noted earlier, she neither offers, nor intends, to establish substitute paternity. Rather, she intends only that her paramour will adopt Beth.

To justify ordering blood tests, at the behest of the mother, under circumstances in which the only effect of results favorable to the mother would be to show that a man who has acted as the child's father, who the child regards as her father, who has acknowledged the child, and who is married to the child's mother is, in fact, not the child's father requires a showing by the mother that to do so is in the best interest of the child. *In the Matter of the Marriage of Ross*, 245 Kan. 591, 783 P.2d 331, 338 (1989) ("Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the district court must consider the best interests of the child, including physical, mental, and emotional needs."); *In the Matter of the Marriage of Zodrow*, 240 Kan. 65, 727 P.2d 435, 440 (1986) (same); *Ban v. Quigley*, 168 Ariz. 196, 812 P.2d 1014, 1017 (App.1990) (Strong public policy of preserving the family unit requires consideration of best interest of the child before or during blood tests at the behest of putative father when neither mother nor presumptive father questions the latter's paternity.). *See also Sandy M. v. Timothy J.*, 138 Misc.2d 338, 524 N.Y.S.2d 639, 642–43 (Fam.Ct. 1988); *Boyles v. Boyles*, 95 A.D.2d 95, 466 N.Y.S.2d 762, 765 (3 Dept.1983). This is especially so when, as here, one means of legitimation was the parties' marriage, after which they held the child out as being *their* legitimate issue. *Boyles*, 466 N.Y.S.2d at 765.

■ The best interest of a child born out of wedlock but subsequently treated as if it were the legitimate issue of the man who married its mother is not necessarily served by establishing that that man is not the biological father, without a concomitant establishment of paternity in someone else. At the very least, however, blood tests ought not be ordered without considering factors bearing on the issue. *See Turner*, 327 Md. at 117, 607 A.2d at 940. *See also In*

*the Matter of the Marriage of Ross,* 783 P.2d at 338; *MacDaniels v. Carlston,* 108 Wash.2d 299, 738 P.2d 254, 261 (1987).

Where there is disputed paternity, *i.e.,* two men are competing for custody, *Turner* made clear that the putative father's motive for pursuing the action—"[his] commitment to the responsibilities of parenthood," *Turner,* 327 Md. at 117, 607 A.2d at 940, and his interest in establishing a relationship with the child—must be balanced against the interest of the presumptive father, and his family, in maintaining an already formed familial relationship. *Id.* The best interest of the child, evidence as to which may come from the child's representative, informs the proper balance. *See Turner,* 327 Md. at 116, 607 A.2d at 940.

A similar weighing process must be conducted where there is neither a putative father nor a presumptive father vying for the child's paternity, but only a man, who has treated the child as his own, locked in combat with the child's mother on the issue. The factors identified in *Turner* apply with equal force to the best interest inquiry in such a case; the respondent is in a position comparable to that of a presumptive father under § 5–1028(c). Thus, the petitioner's interest in obtaining sole custody must be considered and balanced against those of the respondent in protecting the relationship he has formed, and maintained, with the child. In addition, the petitioner's motive in seeking to disestablish, after prior acquiescence in, the respondent's paternity without any attempt to establish another's must also be considered. So too, must Beth's physical, mental, and emotional needs. And, because there is no attempt to establish biological paternal parentage, it is relevant that no genetic information will be generated for use medically or historically. The purpose of this analysis is, of course, to determine what is in the child's best interest. On that question, input from the child's representative, which the court may appoint, *see Turner,* 327 Md. at 116, 607 A.2d at 640, could be important. Significant to the best interest determination is the desirability, from the

child's perspective, of establishing that the man that is the only father the child has ever known, the husband of the child's mother, and who has acknowledged the child, is, in fact, not the child's father. The effect of that determination is not only to establish that the person who the child regarded as her father, is, in fact, not her father, but also to establish that she has no known father.

The trial court did not consider, when ordering the blood tests in connection with this custody dispute, whether to do so was in the child's best interest. In so doing, the court erred. *Turner*, 327 Md. at 117, 607 A.2d at 940. The court also erred in overruling the respondent's exception to the master's admission of the blood tests results into evidence.

Ordinarily, we would remand the case for consideration of the issue in light of the principles we have enumerated. We do not do so in this case, however, because the cat is now out of the bag and cannot now be stuffed back in. *But see In the Matter of the Marriage of Ross*, 783 P.2d at 339 (even though "the blood tests have already been performed ..., the court [on remand] shall not consider the results of the tests until such consideration is determined to be in the child's best interests"). Nor will we require the trial court to again consider temporary, rather than permanent, custody; the uncertainty of its outcome and its potential impact on the stability of the child's life make another interim custody decision inappropriate. *See Domingues v. Johnson*, 323 Md. 486, 500, 593 A.2d 1133, 1139 (1991).

## V.

█ Even though the known blood tests results have been admitted into evidence, the trial court still has to make a custody decision, only it must do so in light of the standard enunciated in *Ross v. Hoffman*, 280 Md. at 178–79, 372 A.2d at 587:

the best interest of the child standard is always determinative in child custody disputes. When the dispute is between a biological parent and a third party, it is pre-

sumed that the child's best interest is subserved by custody in the parent. That presumption is overcome and such custody will be denied if (a) the parent is unfit to have custody, or (b) if there are such exceptional circumstances as [to] make such custody detrimental to the best interest of the child.

Using its independent judgment, the court's task is to determine whether there exists sufficient exceptional circumstances to rebut the presumption that custody should be awarded to the biological parent. Aware of the latter responsibility, in the case *sub judice,* relying on the blood tests results, the court found that, because the respondent was not the biological father, he was a third party and, then, using the *Ross v. Hoffman* standard, *supra,* proceeded to resolve the custody dispute.

The master had recommended that custody remain with the respondent because exceptional circumstances rebutting the presumption existed. The court disagreed and sustained the petitioner's exceptions challenging that recommendation, reasoning:

There is a long line of cases discussing the special circumstances required to overcome the presumption, that it is in the best interest of the child to be with the biological parent. *Piotrowski v. State,* 179 Md. 377[, 381, 18 A.2d 199] (1941); *Dietrich v. Anderson,* 185 Md. 103[, 116, 43 A.2d 186] (1945); *Ross v. Pick,* 199 Md. 341[, 351, 86 A.2d 463] (1952); *Trenton v. Christ,* 216 Md. 418[, 420, 140 A.2d 660] (1958); *Melton v. Connolly,* 219 Md. 184[, 188, 148 A.2d 387] (1959). In these cases the child had been separated from the biological parents for long periods of time (the shortest period found was four and one-half years) and it was thought that it would not be in the best interest of the child to be uprooted from a stable environment in which they lived for so long a time. It was also true that these children had spent almost their entire life separated from the biological parent.

This is not the circumstances of the case at bar. In this case the child has been separated from her biological

mother for six months and prior to that had always lived with her mother.

In assessing whether there are exceptional circumstances, the critical question remains, what is in the best interest of the child? The "best interest" standard " 'is an amorphous notion, varying with each individual case....' " *Domingues*, 323 Md. at 499, 593 A.2d at 1139 (quoting *Montgomery County v. Sanders*, 38 Md.App. 406, 419, 381 A.2d 1154, 1163 (1978)). That determination cannot be made simply by considering the amount of time a parent may have been separated from the child, or even by characterizing the dispute as being between a "biological parent" and a "third party." *See Durkin v. Hinich*, 442 N.W.2d 148, 153 (Minn.1989); *Normand By and Through Normand v. Ray*, 109 N.M. 403, 785 P.2d 743, 747–48 (1990). What is important, rather, is the relationship that exists between the child and each of the parties. The ramifications of a change in those relationships are also critical. Likewise, the importance to the child's stability of having one, as opposed to another, or both, of the relationships continue must be considered as well. *See Domingues*, 323 Md. at 498, 593 A.2d at 1139.

The cases relied on by the trial court do not exhaustively or finally define the universe of circumstances sufficiently exceptional as to warrant resolving a custody dispute against a biological parent and in favor of a third party. Whether the child has established a relationship with a third party sufficient to constitute exceptional circumstances, rebutting the presumption of custody in the biological parent, is not dependent on its development during the absence of the biological parent. A relationship resulting in bonding and psychological dependence upon a person without biological connection can develop during an ongoing biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child's life, encouraged by the biological parent. That the relationships, one with a known biological parent and the other with

an acknowledged, though, in fact, non-biological, parent, progress at the same time, does not render either less viable.[8]

In the present case, that the respondent is not Beth's father is only fortuitous. Prior to her birth, having been told, and after investigation, having come to believe, that she was his child, he allowed his name to be placed on the birth certificate as her father and proceeded to act as her father. He was present in the delivery room when she was born and he lived with her and her mother, with the exception of periods of separation, both before and after he married her mother, from the time of Beth's birth. He has, in short, treated the child as if she were his biological child from the time of her birth up to, and beyond, the determination that he is not. From the time of her birth, until recently, and then only for a short time, Beth lived in Baltimore County. For much of that time, she lived with the petitioner and the respondent. Even when she was placed in the physical custody of the petitioner, the respondent, pursuant to the separation agreement, exercised liberal visitation. Indeed, he had joint custody with the petitioner. The evidence at the hearing further tended to prove that the child viewed the respondent as her father; she is bonded to him, and he to her. According to Dr. Leon Rosenberg, the respondent is Beth's psychological father. For discussion of concept of "psychological parent," see *Sanders*, 38 Md.App. at 412–13, 381 A.2d at 1159.[9]

---

**8.** We do not intend to suggest that simply by living with and treating a minor child as his own that a non-biological "father" automatically acquires rights equal to those of the biological mother, to whom he is married.

**9.** As noted in *Sanders*, 38 Md.App. 406, 381 A.2d 1154 this socio-psychological theory was developed by Joseph Goldstein, Anna Freud, and Albert Solnit in their book, *Beyond the Best Interests of the Child* (1973). Under this theory, the child looks to the "psychological parent," rather than the biological parent for security, love, and a sense of emotional well-being. Once this bond has been established, according to the authors, returning the child to the biological parent would result in emotional trauma.

On the other side of the ledger, aside from the relationship between Beth and the petitioner, no evidence was presented concerning what Beth's living arrangements would be were custody to be transferred to the petitioner. Nor was there evidence presented as to the relationship that exists between Beth and her mother's paramour.

We conclude that there was ample evidence to support the master's determination that exceptional circumstances existed in this case to rebut the presumption that Beth's best interest lay with being in the custody of her mother. From this evidence, a trier of fact could find, as the master did, exceptional circumstances. In any event, the issue is not one that can be resolved as a matter of law.

The trial court focused upon the absence of one of the exceptional circumstances our courts have considered sufficient to rebut the presumption of custody in the natural parent and, because that circumstance did not exist, determined, as a matter of law, that no exceptional circumstances existed in this case. In so doing, the court erred.

We do not, of course, express any opinion as to the outcome of this custody matter. We do not wish to suggest that, on remand, custody could not be awarded to the petitioner; it certainly could. We simply wish to provide guidance for the trial court in addressing the issue of permanent custody. We want to make clear that, using its independent judgment, the court has to determine whether the circumstances *of this case* are sufficiently exceptional as to rebut the presumption that custody should be awarded to the petitioner.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT FOR FURTHER REMAND TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.

Concurring opinion by ELDRIDGE, J., in which McAULIFFE, J., concurs.

ELDRIDGE, Judge, concurring:

I concur in the majority's holding in this case. I agree with the majority's rejection of the Court of Special Appeals' theory that Mrs. Monroe is estopped from obtaining blood tests for the purpose of proving that Mr. Monroe is not Beth's biological father. Moreover, I agree with the majority's conclusion that, in light of the fact that blood tests were ordered and that these tests demonstrate that Mr. Monroe is not Beth's natural father, the custody dispute should be governed by those principles applicable to a custody dispute between a natural parent and a third party. I also agree with the majority's discussion of the trial court's error in applying those principles to the present case. 329 Md. at 773–777, 621 A.2d at 905–907 (1993).

If the majority had limited its discussion in this case to an explanation of its holding, I would not write separately. The majority, however, sets forth in dicta its views about the appropriateness of ordering blood tests in future cases like this. I cannot agree with the Court's position that relevant, ascertainable evidence can be suppressed in order to insure against what a court regards as an undesirable resolution of a dispute.

The majority's dicta in this case compounds the erroneous conclusions reached by the majority in *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992). Although the majority purports to rely on the holding of *Turner v. Whisted,* the case at bar presents an entirely different situation. This case involves a child custody dispute. Furthermore, a man in Mr. Monroe's position, who was not married to the mother at the time of the child's conception or birth, is clearly *not* entitled to any statutory presumption that he is

the natural father of the child.[1]  Nevertheless, the majority expresses the view that the holding in *Turner* should be extended to apply to a child custody dispute between a natural mother and a man who is not presumptively the father of the child.

*Turner v. Whisted, supra,* concerned the motion of one man, the mother's paramour, for blood tests under the Estates and Trusts Article when the mother of the child whose paternity was in dispute was married to another man at the time of the child's birth.  The majority in *Turner* held that, because the mother was married to another man at the time of the child's birth, the paramour could not use blood tests to rebut the statutory presumption that the husband of the mother was the natural father of the child, unless the paramour first could prove that a declaration of the paramour's paternity would be in the best interests of the child.  To the extent that the majority today reaffirms its holding in *Turner v. Whisted,* I disagree for the reasons stated in the concurring and dissenting opinion in that case. *Turner v. Whisted, supra,* 327 Md. at 117–128, 607 A.2d at 941–946 (opinion concurring in part and dissenting in part).

Furthermore, I disagree with the majority's suggestion that the holding in *Turner v. Whisted* should be extended into the realm of future child custody disputes.  The majority indicates that in future cases, a woman, who was unmarried at the time her child was conceived and born, must prove that a finding against the paternity of a man, who

---

1.  Both the Family Law Article and the Estates and Trusts Article expressly set out a rebuttable presumption that a man married to a child's mother at the time of conception or birth is that child's biological father.

Maryland Code (1974, 1991 Repl.Vol.), § 1–206(a) of the Estates and Trusts Article provides in part:

"(a) *Marriage of parents.*—A child born or conceived during a marriage is presumed to be the legitimate child of both spouses."

Code (1984, 1991 Repl.Vol.), § 5–1028 of the Family Law Article provides in part:

"(c) *Presumption.*—(1) There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."

acknowledges paternity of her child, would be in her child's best interests before blood tests can be ordered. The majority's view seems to be that whenever any man, even one who is neither the biological father nor the presumptive father, after treating a child as his own for a period of time, becomes involved in a custody dispute with the child's mother, a blood test shall not be ordered unless a finding against his paternity is in the child's best interests. If the majority's suggestions are followed, a trial court, wary of an "undesirable" resolution of the custody dispute, could admit for one side the least reliable evidence (a man's self-serving assertion that the child is his) and preclude the other side from offering the most reliable evidence (blood tests).

The majority reasons that this best interest determination would be proper as part of an evaluation of good cause under Maryland Rule 2–342.[2] The Court then sets forth in detail factors which it considers relevant to a determination of good cause/best interests.[3] Under the majority's view,

---

**2.** As stated in the concurring and dissenting opinion in *Turner v. Whisted,* 327 Md. 106, 122, 607 A.2d 935, 943 (1992):
   "In all other cases, blood tests, like other mental or physical examinations, are available upon a showing of 'good cause.' Rule 2–423; *Hutzell v. Boyer,* 252 Md. 227, 249 A.2d 449 (1969); *Roberts v. Roberts,* 198 Md. 299, 82 A.2d 120 (1951). In order to establish 'good cause' the party requesting blood tests must demonstrate that the mental or physical character or condition of a another party is material to an issue in the case."

**3.** The majority cavalierly notes that "because there is no attempt to establish biological paternal parentage, it is relevant that no genetic information will be generated for use medically or historically." 329 Md. at 772, 621 A.2d at 905. The majority assumes that knowledge that a certain person is not genetically related to another person has no purpose and that such information is only relevant if there is a concomitant establishment of a genetic relationship. Information that a person is not genetically related to another may become relevant if, for example, a man in Mr. Monroe's position were to manifest some genetic impairment or disorder. In such a situation, it would be important for a child in Beth's position to know that she was not genetically related to that man. This information would be valuable regardless of whether she knew who her biological father was. Moreover, in its zeal for social engineering, the majority dis-

the relationship between a man in Mr. Monroe's position and a child in Beth's position, as well as the physical, mental and emotional needs of a child in Beth's position, should be considered before blood tests may be ordered. Also to be considered is the mother's reason for contesting paternity. 329 Md. at 772, 621 A.2d at 904. The majority suggests that, in the future, each of these factors should be considered, in light of the best interests of the child, before blood tests may be ordered. 329 Md. at 772–773, 621 A.2d at 904–905.

The flaw in the majority's analysis is that the majority uses the "best interests of the child" standard to determine the admissibility of the evidence which will inform the court whether the custody dispute is between two biological parents (with no presumption) or a biological parent and a third party (with a rebuttable presumption favoring the biological parent).[4] Heretofore, the "best interests of the child" prin-

---

counts entirely the strong interest of many people in knowing their "roots" with as much accuracy as possible.

**4.** If Mr. Monroe were Beth's biological father, the custody dispute between him and Mrs. Monroe would have been governed by the principles which apply to disputes between biological or adoptive parents. *See Domingues v. Johnson,* 323 Md. 486, 593 A.2d 1133 (1991); *McCready v. McCready,* 323 Md. 476, 481, 593 A.2d 1128, 1130 (1991); *Ross v. Hoffman,* 280 Md. 172, 175, 372 A.2d 582, 585 (1977). Since Mr. Monroe is not Beth's biological parent, and since he has not adopted her, this custody dispute is governed by the principles applicable to disputes between a parent and a third party. *See Ross v. Hoffman, supra,* 280 Md. at 175–179, 372 A.2d at 585–587.

Under settled Maryland law, there is a presumption that the best interests of a child would be served by granting custody to a parent. The presumption has been set forth by this Court as follows:

" 'Where parents claim the custody of a child, there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary.' "

*Ross v. Hoffman, supra,* 280 Md. at 178, 372 A.2d at 586–587, *quoting Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463, 468 (1952). The presumption applies to a "biological" parent but not to a third party, such as Mr. Monroe, who is neither a "biological" parent nor an adoptive parent. *Ross v. Hoffman, supra,* 280 Md. at 178, 372 A.2d at 587.

ciple was not employed as a standard for determining the admissibility of evidence. Instead, the best interests of the child was regarded as the ultimate issue in a child custody case, to be determined *after* considering all of the relevant evidence and appropriate presumptions. Moreover, the majority's view will allow a trial court to give effect to unilateral assertions while ignoring conclusive evidence as to paternity.

The courts of this State have resolved many child custody disputes between biological parents and third parties, have acknowledged the applicability of the presumption in favor of the biological parents, but, in light of *all* of the evidence, have upheld awards of custody to the third parties as being in the best interests of the children. In these cases the best interests of the child standard was employed, not as a rule for the ascertainment and admissibility of evidence, but as the standard for determining the ultimate decision in the case. *See, e.g., DeGrange v. Kline,* 254 Md. 240, 254 A.2d 353 (1969); *Melton v. Connolly,* 219 Md. 184, 148 A.2d 387 (1959); *Trenton v. Christ,* 216 Md. 418, 140 A.2d 660 (1958); *Ross v. Pick,* 199 Md. 341, 351, 86 A.2d 463, 468 (1952); *Pastore v. Sharp,* 81 Md.App. 314, 567 A.2d 509 (1989), *cert. denied,* 319 Md. 304, 572 A.2d 182 (1990); *Newkirk v. Newkirk,* 73 Md.App. 588, 535 A.2d 947 (1988). There is no sound reason why the Court should suggest that this logical approach to child custody cases be abandoned. The majori-

Moreover, it is established that natural or adoptive parents have constitutionally protected rights with respect to their children. *See, e.g., Lehr v. Robertson,* 463 U.S. 248, 256–265, 103 S.Ct. 2985, 2991–2995, 77 L.Ed.2d 614, 623–629 (1983); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511, 519 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Wisconsin v. Yoder,* 406 U.S. 205, 213–214, 230–232, 92 S.Ct. 1526, 1532, 1541, 32 L.Ed.2d 15, 23–24, 33–35 (1972); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972) ("The rights to conceive and to raise one's children have been deemed 'essential' "). The rebuttable presumption that the best interests of a child are served by granting custody to a natural or adoptive parent accommodates both the constitutionally protected interests of parents and the principle of doing what is best for the child.

ty, instead of advocating continued reliance on the rebuttable presumption in favor of a biological parent's custody, which protects both the rights of the parent and the best interests of the child, has expressed a view which would undermine the presumption by authorizing a trial court to blind itself when determining if a custody dispute is between two parents or between a parent and a third party.

Normally any contested case before a court is resolved after the relevant facts are ascertained and the pertinent law is applied. Once again, under the majority's approach, sometimes the most relevant facts will not be ascertained in order to prevent what a court may regard as an unsatisfactory resolution of the dispute. As I stated in *Turner v. Whisted, supra,* 327 Md. at 123–124, 607 A.2d at 944:

> "The majority has formulated a procedure whereby the trial court must determine the ultimate result, in order to discover whether that result is satisfactory, before it can ascertain the facts. If the court decides that it likes the predicted ultimate result, then the fact finding process continues. If the court decides that it does not like the predicted ultimate result, the process ends.

> "I cannot subscribe to the proposition that relevant, ascertainable evidence should be excluded because it may lead to a result which the court does not like. The trial court's conjecture over whether the result will be satisfactory should not determine whether facts relevant to that result are concealed. I simply cannot agree with the majority's view that a government (through its courts) is entitled to determine in a particular case that one will be better off by the perpetuation of a falsity and the suppression of relevant, unprivileged facts."

The majority's dicta today exacerbates the errors of the majority in *Turner v. Whisted, supra.*

Judge McAULIFFE has authorized me to state that he concurs with the views expressed herein.