841 A.2d 361

Kevin Wayne STUBBS

v.

Janie Marie COLANDREA et al.

No. 0445, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Feb. 2, 2004.

Steven T. Cain (Cain & Wyrough, PC on the brief), Upper Marlboro, for appellant.

Sue Ann Lewis Armitage (Armitage & Armitage, PA on the brief), Lexington Park, for appellee.

Argued before EYLER, DEBORAH S. KRAUSER RODOWSKY, and LAWRENCE F. (retired, specially assigned), JJ.

RODOWSKY, Judge.

Appellant, Kevin Wayne Stubbs (Mr. Stubbs), brought this action alleging that he is the biological father of, and seeking visitation with, Jonnie Lynn Colandrea (Jonnie), a child conceived and born during the marriage of the appellees, Janie Marie Colandrea (Mrs. Colandrea) and David Colandrea (Mr. Colandrea). After the Circuit Court for St. Mary's County denied the blood test requested by Mr. Stubbs and also denied his request for a declaration of paternity, Mr. Stubbs noted this appeal. For the reasons hereinafter set forth, we shall affirm.

The appellees were married May 15, 1993. Their daughter, Jessie, was born April 2, 1990, and their son, Devyn, was born October 8, 1994. Jonnie was born January 25, 1998. Preceding Jonnie's birth the appellees, Jessie, and Devyn resided in Chesapeake Beach in a home that was across the street from that of Mr. Stubbs's father, where Mr. Stubbs was residing. Apparently as a result of Mr. Colandrea's drinking, the appellees were separated on four occasions in the period from 1995 through 1999, but they have been "back together" since January 2000.

Mr. Stubbs filed the instant action on April 7, 2000, requesting that an "appropriate" blood test be ordered.[1] In anticipation that he would be determined to be the father, he further requested a court-structured visitation schedule. His complaint named only Mrs. Colandrea as a defendant, but Mr. Colandrea intervened in the action.

---

1. In this opinion we shall use the term "blood" test to include genetic testing.

The request for a blood test was referred to a master who took testimony for two days. There was conflicting testimony concerning the relationships between Mr. Stubbs and Mrs. Colandrea and between Mr. Stubbs and Jonnie. The evidence also dealt with Jonnie's relationships with Jessie, Devyn, Mr. Colandrea, and Mrs. Colandrea. Those relationships within the Colandrea family were the subject of testimony by a child psychologist. The master, applying a best interests of the child standard, recommended that the request for a blood test be denied.

After the unfavorable report and recommendation from the master, Mr. Stubbs changed counsel, who filed exceptions to the master's report. These exceptions included a challenge to using the best interests of the child standard for determining whether a blood test should be administered. Argument on the exceptions was had before Judge John Hanson Briscoe, who denied all of them. The parties then agreed to submit the issue of paternity for decision by the court, based upon the record made before the master. The court (Judge Karen H. Abrams) concluded that it was not in Jonnie's best interest to declare Mr. Stubbs to be her biological father. The court further held that Mr. Stubbs had failed to overcome the presumption that Mr. Colandrea is Jonnie's biological father.

In his brief on appeal to this Court, Mr. Stubbs makes a number of arguments, which we believe fairly may be distilled into the five contentions set forth below:

I. The circuit court could not refer the request for a blood test to a master;

II. An attorney should have been appointed for Jonnie;

III. Whether a blood test should be administered is controlled by the "Paternity Act," Maryland Code (1984, 1999 Repl.Vol.), Title 5, Subtitle 10 of the Family Law Article (FL);

IV. A best interests of the child standard should not be used to determine whether a blood test should be administered; and

V. Even if a best interests standard is applicable, the circuit court abused its discretion in its application of that standard in this case.

Additional facts will be stated as necessary in our analysis of the arguments presented.

## I. Use of Master

■ Mr. Stubbs submits that this case is a paternity action and that, under Maryland Rule 9–208(a)(1), it may not be referred to a master, because paternity actions are not listed in that rule. Rule 9–208(a)(1) in relevant part provides:

"If a court has a full-time or part-time standing master for domestic relations matters and a hearing has been requested or is required by law, the following matters arising under this Chapter shall be referred to the master as of course unless the court directs otherwise in a specific case:

[Thereafter subparagraphs (A) through (J) set forth certain types of proceedings, none of which is a paternity action.]

"(K) such other matters arising under this Chapter and set forth in the court's case management plan filed pursuant to Rule 16–202 b."

We perceive no error. In overruling Mr. Stubbs's exception, the circuit court concluded that referral to a master was appropriate under its "differentiated case management plan [and] the relevant statutes and rules[.]" Because Mr. Stubbs has not presented in this record the differentiated case management plan for the Circuit Court for St. Mary's County, we are unable to determine whether a paternity action falls under Rule 9–208(a)(1)(K).

In any event, Rule 9–208 is not a prohibition against referral to a master of proceedings that are not listed therein. If a paternity action is not referable "as of course" to a master, it nevertheless may be so referred by an exercise of the court's discretionary power under Rule 2–541(b)(2). The latter rule permits referrals to a master of any matter or issue, other

than one specified in Rule 9–208, which is "not triable of right before a jury."

## II. Counsel for Child

 Jonnie should have been made a party, Mr. Stubbs submits, and counsel should have been appointed to represent her, particularly because the court applied a best interests of the child standard in determining whether a blood test would be ordered. The circuit court, in denying this exception, pointed out that Mr. Stubbs had not raised the issue prior to or at the master's hearing. Nevertheless, the court concluded that Jonnie's interests were adequately represented.

In this Court Mr. Stubbs asserts that under Rule 2–211(a) it was the responsibility of the trial court to assure complete joinder. That rule provides for joinder of a person as a party if, *inter alia,*

"(2) disposition of the action may impair or impede the person's ability to protect a claimed interest relating to the subject of the action[.]"

Rule 2–211 further states that "[t]he court shall order that the person be made a party if not joined as required by this section."

Joinder of Jonnie was not required by Rule 2–211; rather, joinder through the medium of appointment of counsel was discretionary. In *Turner v. Whisted,* 327 Md. 106, 607 A.2d 935 (1992), involving a claim of paternity by a third party to a marriage, the Court of Appeals remanded for a balancing of the interests of the asserted father and the interests of the child, when determining whether to order a blood test. Noting that the child was not a party to the action, the Court of Appeals said that the trial court "might even appoint counsel to represent [the child's] interests if it believes that those interests might be compromised by the blood test. If [the child's] best interests would be jeopardized by submitting to a blood test, the child's representative may then request a protective order." *Id.* at 116, 607 A.2d at 940. In the case before us, the court, at the exceptions hearing, concluded that

Jonnie's interests had been adequately presented to the court by the child psychologist who had examined Jonnie. There was no abuse of discretion.

## III. The Paternity Act

■ Mr. Stubbs argues that FL § 5–1029 of the Paternity Act governs whether the blood test should have been administered. Under that provision, blood tests are mandatory, if requested by a party. FL § 5–1029(b); *Langston v. Riffe*, 359 Md. 396, 429, 435, 754 A.2d 389, 406–07, 410 (2000).

In *Turner, supra*, the Court of Appeals held that the request for blood tests, sought by a man attempting to establish that he was the biological father of a child born during the marriage of the mother and her husband, was to be decided by applying Maryland Code (1974, 2001 Repl.Vol.), § 1–208 of the Estates and Trusts Article (ET) and Maryland Rule 2–423. Further, in making that determination, the best interests of the child standard was to be applied. *Turner*, 327 Md. at 117, 607 A.2d at 940 ("[T]he trial court could have, and should have, held a hearing to determine whether ordering the blood tests would be contrary to [the child's] best interests").

In *Langston v. Riffe* the Court of Appeals reviewed *Turner* and two other cases in which a best interests analysis had been applied, *Monroe v. Monroe*, 329 Md. 758, 621 A.2d 898 (1993), and *Sider v. Sider*, 334 Md. 512, 639 A.2d 1076 (1994).[2] The Court said that "[g]iven the 'unique' circumstances of *Sider*, as well as *Turner* and *Monroe*, we chose not to apply or extend their holdings further than the unique facts of those cases." *Langston*, 359 Md. at 432–33, 754 A.2d at 408–09 (footnote omitted).

The instant matter is within the unique facts of *Turner*. As a basis for court ordered visitation, Mr. Stubbs seeks a blood

---

**2.** In the *Monroe* and *Sider* cases, blood tests that established that the man to whom the mother was married was not the father of the child at issue already had been administered. The Court of Appeals in those cases applied the best interests test to issues other than whether a blood test should be administered.

test to establish his paternity of a child conceived and born during the marriage of the appellees. Thus, *Turner* ordinarily would be dispositive of this argument by Mr. Stubbs.

Citing provisions of the Paternity Act, however, Mr. Stubbs argues that paternity cannot be decided without first scientifically establishing the identity of the biological father. Among the cited statutes is FL § 5–1002, which was amended by adding subsection (c) after *Turner* was decided. Accordingly, we must address that amendment.[3]

FL § 5–1002(c) reads:

"Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child."

FL § 5–1002(c) seems to expand the operation of FL § 5–1029(b), which reads:

"On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be *excluded* as being the father of the child."

(Emphasis added). Analysis of the impact of this amendment requires consideration of the legal background on which it was superimposed.

Part of that background is ET § 1–208, which provides in relevant part:

"(a) *Child of his mother.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his mother.

"(b) *Child of his father.*—A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father:

---

**3.** Dicta in *Langston*, 359 Md. at 433 n. 16, 754 A.2d at 409 n. 16, observed that "the circumstances in *Sider* would now presumably be addressed by" FL § 5–1002(c). *Turner* is not mentioned in the footnote.

"(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings[.]"

In *Thomas v. Solis,* 263 Md. 536, 283 A.2d 777 (1971), the Court of Appeals held that a predecessor statute to ET § 1–208 was not limited to matters of inheritance and could be used affirmatively to establish paternity. The putative father-plaintiff in that case alleged that the three children there involved had been conceived by him and born while he and their mother were cohabiting while unmarried. Subsequently, the mother terminated the relationship, but she left the children in the care of the plaintiff. Later, the mother married a third person and obtained a court order awarding her custody of the children. In his complaint, which the Court of Appeals held to state a justiciable issue, the putative father sought not only a declaration of paternity, out of concern that the mother's husband might adopt the children without notice to the plaintiff, but also a declaration of his responsibilities. *Id.* at 537, 545, 283 A.2d at 778, 782.

*Taxiera v. Malkus,* 320 Md. 471, 578 A.2d 761 (1990), involved a mother who was unmarried when her child was conceived and born. She contended that the father was a man who had died four months before the child's birth. The mother sought a paternity declaration in an action predicated on ET § 1–208, but she also filed under the Paternity Act. Both proceedings were brought against the estate of the putative father. The reported case is the appeal from the dismissal of the Paternity Act proceeding. The Court of Appeals held that, although it was clear that ET § 1–208(b) is a legitimating statute, a harmonious reading of that statute with the Paternity Act compelled the conclusion that the circuit court could determine, in the paternity action, whether the putative father was the biological father of the child, and that this ruling could be made without regard to whether the court could enter a support order against the estate of the putative father. *Id.* at 481–82, 578 A.2d at 766.

Both *Thomas v. Solis* and *Taxiera v. Malkus* dealt with children born out of wedlock. Complexities arise, however, when a man asserts that he is the biological father of a child born, or, as here, conceived and born, during the marriage of the mother to a different man.

That complexity was presented in *Turner, supra,* in which the Court first addressed how a biological father potentially could acquire rights with respect to a child born during the marriage of the mother to another man. Quoting the dissent by Justice Brennan in *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), the Court of Appeals said:

" '[A]lthough an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by com[ing] forward to participate in the rearing of his child ... his interest in personal contact with his child acquires substantial protection under the Due Process Clause.' "

*Turner,* 327 Md. at 115–16, 607 A.2d at 940 (quoting *Michael H.,* 491 U.S. at 142–43, 109 S.Ct. at 2352, 105 L.Ed.2d at 118–19) (citations, footnote, and internal quotations omitted).

The precise issue in *Turner* was whether the plaintiff was entitled to a blood test to determine the fact of his self-asserted paternity. To resolve that issue the court initially addressed whether ET § 1–208 or the Paternity Act governed. If the former applied, there was a presumption of legitimacy, because the child was born during the mother's marriage. *See* ET § 1–206(a) ("A child born or conceived during a marriage is presumed to be the legitimate child of both spouses"). In contrast (but not articulated in the *Turner* opinion) the facts of that case gave rise to no presumption of legitimacy under the Paternity Act. *See* FL § 5–1027(c)(1) ("There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of concep-

tion"). Further, under ET § 1–208, the authority to order a blood test rests on a discovery request under Maryland Rule 2–423, for a physical examination, and requires good cause to be shown. *Turner,* 327 Md. at 113–14, 607 A.2d at 938–39. On the other hand (although unarticulated in the *Turner* opinion) if the vehicle for the paternity determination was the Paternity Act, a blood test would have been mandatory. *See* FL § 5–1029(b). Because ET § 1–208 presented "the 'more satisfactory' and 'less traumatic' means of establishing paternity," the *Turner* Court held that the appropriate vehicle for establishing paternity is ET § 1–208 in a case in which a third party asserts that the presumed father is not the biological father. *Turner,* 327 Md. at 113, 607 A.2d at 938.

Applying the appropriate statute, ET § 1–208, the *Turner* Court further held that, in determining on remand whether a blood test should be ordered, the trial court

1. "should consider the extent of [the third party's] commitment to the responsibilities of parenthood, and balance his interest in establishing his status as [the child's] natural father against the [parents'] interest in protecting the integrity of the familial relationships already formed. This balance of interests should be considered in connection with the court's paramount concern of protecting [the child's] best interests."

*Id.* at 117, 607 A.2d at 940.

Thereafter, Chapter 609 of the Acts of 1997 (Senate Bill 636) added subparagraph (c) to FL § 5–1002, quoted above. The purpose clause of the bill states, *inter alia,* that it was for the purpose of "clarifying that a putative father may file a paternity action." 1997 Md. Laws, Chap. 609, at 3333.

Although "putative father" is not a defined term in the Paternity Act, the quoted term has a settled legal meaning. Black's Law Dictionary defines "putative father" to mean "[t]he alleged biological father of a child born out of wedlock." Black's Law Dictionary 623 (7th ed.1999).

That the dictionary meaning of "putative father" was intended by the General Assembly when using that term in FL § 5–

1002(c) is confirmed by construing subsection (c) compatibly with the balance of FL § 5–1002 to which subsection (c) was added. Those preexisting subsections read as follows:

"(a) *In general.*—The General Assembly finds that:

"(1) this State has a duty to improve the deprived social and economic status of children born out of wedlock; and

"(2) the policies and procedures in this subtitle are socially necessary and desirable.

"(b) *Purpose.*—The purpose of this subtitle is:

"(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

"(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

"(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock."

Thus, "a child" in subsection (c) refers to a child born out of wedlock.

Further confirming our interpretation of FL § 5–1002(c) are the Maryland legislative history of Senate Bill 636, federal legislation, and federal legislative history. Senate Bill 636 "include[d] child support enforcement procedures mandated by P.L. 104–193/HR 3734—The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 [ (the Federal Act) ]." Statement of Executive Director of the Maryland Child Support Enforcement Administration, Department of Human Resources to Judicial Proceedings Committee dated February 25, 1997, on file with Department of Legislative Services.[4] The Executive Director's statement explained that

---

4. The changes in child support enforcement policy brought about by Title 3 of the Personal Responsibility and Work Opportunity Reconciliation Act, sometimes abbreviated, "PRWORA," have been described as follows:

under the requested addition to FL § 5–1002 "[t]he putative father may initiate a paternity action with the Child Support Enforcement Administration." Similarly on file with the Department of Legislative Services is a letter from the Deputy Secretary, Department of Human Resources to the Chairman of the Judicial Proceedings Committee covering transmittal of a memorandum providing "legal perspectives and justifications" for the passage of Senate Bill 636. In relevant part that memorandum advised:

"VOLUNTARY AND CONTESTED PATERNITY

"**1. Federal Requirement Citation: HR 3734 Sec. 331, Amending 42 U.S.C. § 666(a)(5)**

The putative father may initiate a paternity action.

"**House Bill 1074/Senate Bill 636: Page 4; FL § 5–1002**

Provides equal access and application of the law to mothers and putative fathers seeking support.

"**Legal Perspective/Justification:**

Clarifies Maryland law by providing express statutory authority for a putative father to file, as a plaintiff in a case brought under the Paternity Act, to establish his

---

"The PRWORA, also known as 'welfare reform,' made sweeping changes in social policy relating to low-income people. It replaced the Aid to Families with Dependent Children (AFDC) program with the Temporary Assistance to Needy Families (TANF) program. The new program consists of federal block grants that are distributed to states, which then use the money to provide cash assistance and other supportive services to low-income families within their borders. Although this funding structure gives the states greater flexibility in designing their own public assistance programs, they are required to work toward program goals, satisfy a maintenance-of-effort requirement for the expenditure of state funds, and abide by federal regulations.

"Title III of the PRWORA amended the Child Support Enforcement Program (IV–D), which provides federal money to assist states in collecting child support from absent parents. *See 42 U.S.C. §§ 651–669.* State IV–D programs must currently provide child support services to all cases in which the custodial parent either receives temporary assistance under TANF or Medicaid, or requests IV–D assistance."

*Kansas v. United States,* 214 F.3d 1196, 1197 (10th Cir.2000) (footnotes omitted).

rights with respect to a child born out-of-wedlock. This right is already implied in Maryland case law. *See Thomas v. Solis,* 263 Md. 536, 283 A.2d 777 (1971) (a reasonable construction of Maryland law provides that a father can obtain a filiation declaration)."

When enacting the Federal Act, Congress made findings which include the following:

"(1) Marriage is the foundation of a successful society.

"(2) Marriage is an essential institution of a successful society which promotes the interests of children.

. . . .

"(6) The increase of out-of-wedlock pregnancies and births is well documented. . . .

. . . .

"(8) The negative consequences of an out-of-wedlock birth on the mother, the child, the family, and society are well documented[.]"

Act Aug. 22, 1996, P.L. 104–193, Title I, § 101, 110 Stat. 2110.

The Federal Act also sets state paternity-establishment program standards, compliance with which is required for continued federal assistance. 42 U.S.C. § 652(g). The standards are expressed as paternity establishment percentages, either "IV–D" or "statewide," that do not substantially differ for present purposes. 42 U.S.C. § 652(g)(2)(A) and (B). The less complex formula, the statewide paternity establishment percentage,

"means, with respect to a State for a fiscal year, the ratio (expressed as a percentage) that the total number of minor children—

"(i) who have been born out of wedlock, and

"(ii)the paternity of whom has been established or acknowledged during the fiscal year,

bears to the total number of children born out of wedlock during the preceding fiscal year[.]"

42 U.S.C. § 652(g)(2)(B).

The Maryland officials who recommended the General Assembly's response to the Federal Act pointed to 42 U.S.C. § 666 as requiring the addition of FL § 5–1002(c). Section 666 ordains that "each State must have in effect laws requiring the use of [certain] procedures ... to increase the effectiveness of the [child support enforcement] program[.]" 42 U.S.C. § 666(a). Among the required procedures are those concerning paternity establishment, including "[p]rocedures concerning genetic testing." 42 U.S.C. § 666(a)(5)(B). Subsubsection (B) in relevant part provides:

"(i) Genetic testing required in certain contested cases. Procedures under which the State is required, in a contested paternity case (*unless otherwise barred by State law*) to require the child and all other parties ... to submit to genetic tests upon the request of any such party, if the request is supported by a sworn statement by the party—

"(I) alleging paternity, and setting forth facts establishing a reasonable possibility of the requisite sexual contact between the parties; or

"(II) denying paternity, and setting forth facts establishing a reasonable possibility of the nonexistence of sexual contact between the parties."

(Emphasis added).

In its enacted version, the Federal Act was the product of a conference committee of managers from each of the Houses of the Congress. The conference report, House Report 104–725 of July 30, 1996, advised that it contained "a number of new provisions that have no direct parallel in current law." H. Rep. No. 104–725 (1996). Among these provisions was one described as follows: "Standing of Putative Fathers. Putative fathers must have a reasonable opportunity to initiate a paternity action." *Id.*

A gender neutral reading of 42 U.S.C. § 666(a)(5)(B), the federal prodding for FL § 5–1002(c), makes the federal provi-

sion applicable to males. Nevertheless, in context, those males are putative fathers of children born out of wedlock who seek to honor their support obligations as part of having their paternity established.

In the case now before us Jonnie is not an illegitimate child, and Mr. Stubbs is not a putative father. Jonnie is being supported by her mother and her presumed father. Nothing in the text of FL § 5–1002(c), or in its Maryland or federal legislative histories, indicates that the General Assembly intended to alter the *Turner v. Whisted* test for determining whether a blood test should be ordered under the circumstances presented here, or that the Federal Government intended to require, under the circumstances presented here, a mandatory blood test similar to that provided by FL § 5–1029.

### IV. Best Interests Standard

A considerable portion of Mr. Stubbs's brief in this Court is devoted to a frontal attack on *Turner*. The arguments resurrect the policy issues represented by the majority opinion and the concurring and dissenting opinion in *Turner*. That decision, of course, is binding authority on this Court. The arguments are more appropriately advanced in a quest for a grant of certiorari by the Court of Appeals.

Mr. Stubbs also argues that *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), requires that blood test results be obtained before a paternity determination is made. In the three cases reported in *Langston*, men who had been adjudicated under the Paternity Act to be fathers of children born out of wedlock sought to reopen those determinations based on the subsequent enactment of FL § 5–1038(a)(2)(i)2. That statute expressly permits vacating a judgment of paternity "if a blood or genetic test done in accordance with § 5–1029 ... establishes the exclusion of the individual named as the father in the order." *Langston*, 359 Md. at 405, 754 A.2d at 394. After holding that the legislation was retrospective, the Court in *Langston* held that the best interests of the child standard was inapplicable to whether the blood tests should be administered. First, the plain language of FL § 5–1029(b) makes the

blood test mandatory. *Id.* at 425, 754 A.2d at 404. Second, the plain language of FL § 5–1038(b) excepted the reopening of a declaration of paternity from other issues that may be determined under the best interests standard in a proceeding to reopen a judgment under the Paternity Act. *Id.* Here, we do not deal with a child born out of wedlock or with a putative father who seeks to reverse a paternity determination and accompanying support order. Rather, we deal here with a request to establish paternity by a blood test that, under *Turner*, is to be evaluated under ET § 1–208. *Langston* is inapplicable.

## V. Abuse of Discretion

■ The remaining argument advanced by Mr. Stubbs submits that, even if a best interests standard determines whether a blood test should be administered in this case, the circuit court abused its discretion in its application of that standard to the facts presented here. The argument is in large part structured on the evidence most favorable to Mr. Stubbs. The master, however, was presented with conflicting evidence from which he made findings that were accepted by the circuit court and that are supported by the evidence. That evidence, in turn, reveals no abuse of discretion, as our brief review set forth below reveals.

Mr. and Mrs. Colandrea reconciled in January 2000 and are currently living together as husband and wife and, with the three children, as a family. The family unit is stable and happy. Mr. Colandrea has acted as father to all three children. He was present when each was born. He provides for them. He takes them to school and on family vacations. He cooks for them, bathes them, changes diapers, assists them when Mrs. Colandrea is ill, plays with them, and "spends a lot of [time] with all three children." The three Colandrea children are close and play together.

Mr. Stubbs last saw Jonnie in December 1999, when she was two years old. She does not ask for him; nor do the other Colandrea children. The master found, from a good deal of conflicting evidence, that Mr. Stubbs never lived with

Mrs. Colandrea and her children, but he was a regular visitor in Mrs. Colandrea's home.[5] The relationship between Mr. Stubbs and Jonnie, Devyn, and Jessie was that of a friend.

Based on the evidence from a child psychologist, Jonnie is a well adjusted child who has "clearly and positively bonded with [Mr. Colandrea, Mrs. Colandrea], and her siblings." Mr. Colandrea is, at least, the psychological father of Jonnie. Based on the psychologist's opinion, "there would be no conceivable benefit to [Jonnie] if [Mr. Stubbs] is determined to be her father." The potential emotional and mental upset from that discovery "far outweighs any benefit to [Jonnie] in having [Mr. Stubbs] determined to be her father." [6]

---

5. The master described the intimate relationship with Mrs. Colandrea, from Mr. Stubbs's perception, "as one of going over the fence."

6. The child psychiatrist, Dr. James E. Lewis, recognized that there would be no adverse effect on Jonnie from the mere administration of the blood test. He clearly explained, however, why a blood test that determined Mr. Stubbs to be the biological father could not be separated, as a practical matter, from how that information was used. Dr. Lewis foresaw three possibilities. At one extreme, Mr. Stubbs would not use the information to attempt to establish a relationship with Jonnie. As demonstrated by the instant litigation, that was not the situation in this case.

At the other extreme, Mr. Stubbs would tell Jonnie that he was her father. In Dr. Lewis's opinion that "would be devastating to her. First of all, she doesn't know how to comprehend what that means." That scenario would involve "taking the child who has no emotional difficulties, who has no psychological difficulties and creating an emotional conflict for her."

A middle ground possibility would be that Mr. Stubbs would try to form some kind of a bond with Jonnie "without telling her that he's the father or without anybody else telling her and try to explain to her that he's a friend of the family and see her in some way." Under that scenario

"there would have to be some way of explaining to the older children, who are very bonded to their little sister, they all talk to each other, its going to be impossible to keep it as some kind of big secret among the siblings and have some way of explaining to the older two why it is that Mr. Stubbs, who they have a negative or bad memory of, wants to see their little sister."

In addition, the older children's "perception is that their mother and Mr. Stubbs had some tensions between them so all of that would have to be diffused and resolved before even this family friend arrangement could work."

Mrs. Colandrea testified that Jonnie was conceived between May 3 and May 6, 1997, at her mother's home in Mechanicsville where she, her husband, and the two children were living for two months in order for Mrs. Colandrea to assist her mother, who had been diagnosed with cancer. While acknowledging having had sexual relations with Mr. Stubbs, she testified that they did not begin until June 1997 and took place from time to time thereafter until November 1999. She denied that she and her husband were separated at all in 1997. Following the paternity hearing, Judge Abrams concluded, when discussing the biological link aspect of Mr. Stubbs's potential legally recognized interests in the child, that "there is no evidence that [Mr. Stubbs and Mrs. Colandrea] engaged in sexual relations at the time that Jonnie Lynn was conceived[.]"

We hold that, under the facts described above, the circuit court acted within its discretion in determining, under *Turner v. Whisted,* that the best interests of Jonnie outweighed any interests of Mr. Stubbs in having a blood test administered.

For all the foregoing reasons, the judgment of the Circuit Court for St. Mary's County is affirmed.

**JUDGMENT OF THE CIRCUIT COURT FOR ST. MARY'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**