16 A.3d 233

**William CORBETT**

v.

**Amy MULLIGAN.**

**No. 1033, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

March 30, 2011.

Keith N. Schiszik (Day & Schiszik, on the brief), Frederick, MD, for appellant.

Laura N. Venezia (Conklyn & Associates, on the brief), Frederick, MD, for appellee.

Panel: EYLER, JAMES R., GRAEFF, and JAMES P. SALMON (Retired, Specially Assigned), JJ.

GRAEFF, J.

William Corbett, appellant, filed a complaint in the Circuit Court for Frederick County against Amy Mulligan, appellee, to determine the paternity of her daughter, Gracelyn.[1] Mr.

---

1. Throughout the record and the briefs, the child's name is spelled "Gracelyn" and "Gracelynn." We will use Gracelyn in this opinion.

Corbett appeals from the circuit court's order denying his request for paternity testing and ordering that Mr. Thomas Mulligan is the legal father of Gracelyn.

Mr. Corbett presents three questions for our review, which we quote:

1. Under the precepts of either Maryland Family Law Article 5–1027(c), or Estates and Trusts Article 1–206(a), is a child who is *conceived during the marriage* but after the separation of a husband and wife, and who is *born after their divorce,* considered to be "born out of wedlock"?

> A) If so, was the Judge required by the Family Law statutes to order blood tests without a "best interests analysis" so as to determine the child's biological paternity?

> B) If a blood test is not mandatory, then did the Judge err in determining that the Appellant had not demonstrated by the preponderance of the evidence that it was in [Gracelyn's] best interest to have genetic/blood testing done to determine the identity of her biological father?

2. Did the trial court err by placing significant import on an Affidavit of Paternity, purportedly signed by the Appellee's former husband, that was a) never produced at trial, and which, b) if completed and signed as claimed by the Appellee, would have demonstrated that the signers were guilty of perjury?

3. Did the Court's denial of the Appellant's request for blood testing also result in a denial of his due process rights to establish his parenthood, which is a basic human right and liberty guaranteed by the Constitution?

We will dispose of the appeal on the first issue. For the reasons set forth below, we hold that the request for genetic testing was governed by the paternity provisions in the Family Law Article, which required the court to order such testing upon Mr. Corbett's request. Accordingly, we shall reverse the judgment of the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. and Ms. Mulligan were married on March 26, 1999. They had two sons and one daughter.

The Mulligans separated in April 2009.[2] During the separation, Ms. Mulligan entered into a relationship with Mr. Corbett, and she became pregnant. Her relationship with Mr. Corbett ended before the child was born, and Ms. Mulligan reconciled with Mr. Mulligan. Gracelyn, the child conceived while Mr. and Ms. Mulligan were married, but separated, was born on January 25, 2010. Although Mr. and Ms. Mulligan were living together at the time of Gracelyn's birth, they were no longer married; they were divorced on September 25, 2009.

On February 25, 2010, Mr. Corbett filed a Complaint for Paternity, Child Support and Visitation Schedule. He asserted that it was in Gracelyn's best interests "to know for certain who her father is, both for purposes of involvement and bonding as well as for future medical needs." He alleged that it would be in Gracelyn's best interests to develop a relationship with him, her actual father. He asked the court to hold a hearing to determine whether DNA testing should be ordered "to determine the parentage of the child," to establish a visitation schedule, and to determine appropriate child support payments.

On March 29, 2010, Ms. Mulligan filed a Motion to Dismiss for Failure to State a Claim. She maintained that Gracelyn was "the legal child of Thomas Mulligan" pursuant to Md. Code (2001 Repl.Vol.), § 1–206 of the Estates and Trusts Article ("E.T."), and she lived with her parents and siblings in Frederick, Maryland. Ms. Mulligan alleged that Mr. Corbett, who lived in Pennsylvania, had not had any contact with

---

2. There was some dispute about the actual date that the Mulligans separated. Mr. Mulligan testified that they separated in April 2009. In the complaint for divorce filed on May 6, 2009, however, Ms. Mulligan stated that she had lived separate and apart from Mr. Mulligan since April 4, 2008. When questioned about this by counsel for Mr. Corbett, Ms. Mulligan asserted her Fifth Amendment right against self-incrimination.

Gracelyn, he had not demonstrated "good cause of sufficient persuasive force to overcome the statutory presumption" that Mr. Mulligan was the legal father, and the court "should not require a blood test to determine 'paternity' of a child living with her legal father in a stable home environment."

On April 9, 2010, Mr. Corbett filed his response to Ms. Mulligan's motion to dismiss. He alleged that Mr. and Ms. Mulligan were separated when Gracelyn was conceived, and they were divorced when Gracelyn was born. Because Gracelyn was not born during an intact marriage, Mr. Corbett asserted that E.T. § 1–206 did not apply, but rather, the applicable statutory provision was Md.Code (2006 Repl.Vol.), § 5–1029(b) of the Family Law Article ("F.L."), which requires that "blood or genetic tests" be ordered upon request. Although he acknowledged that he had not had contact with Gracelyn, Mr. Corbett asserted that there was a court order that barred him from contacting Ms. Mulligan. He stated that he had requested visits with Gracelyn, through his attorney, but Ms. Mulligan had rebuffed all his requests. On April 15, 2010, the circuit court denied Ms. Mulligan's motion to dismiss.

The court held a hearing on May 13, 2010. Mr. Mulligan testified that he and Ms. Mulligan separated in April 2009, but she returned in September of that year. Mr. Mulligan actively participated in preparing for Gracelyn's birth. He paid for and attended all of Ms. Mulligan's prenatal appointments, and he had "pretty much delivered the baby" with the assistance of a midwife. After Gracelyn was born, he continued to pay her medical bills, as well as paying for diapers, clothing, and "everything she's needed." He participated in daily care, and he obtained a second job to pay expenses because Ms. Mulligan was not working outside the home.

Mr. Mulligan also testified regarding the bond between Gracelyn and her siblings and the family activities they participated in together. He described his children as "thrilled" to have Gracelyn in their family, stating that his sons were

protective of Gracelyn and his daughter acted "like a little mom sometimes."

Regarding the issue of paternity of Gracelyn, Mr. Mulligan recognized the possibility that Mr. Corbett was the biological father.[3]  Mr. Mulligan encouraged Ms. Mulligan to contact Mr. Corbett on the day Gracelyn was born because Mr. Corbett "ha[d] a right to be there."  He told Ms. Mulligan, however, that if Mr. Corbett was unwilling to sign the birth certificate, he "would love to be the baby's father."  Although Mr. and Ms. Mulligan were not married, Mr. Mulligan testified that they were engaged and planned to marry as soon as time permitted.

On cross-examination, counsel for Mr. Corbett pressed Mr. Mulligan regarding his past financial troubles and criminal history.  Mr. Mulligan admitted that his home had been in foreclosure, but he testified that he had filed for bankruptcy, and the home was no longer in foreclosure.  On two previous occasions, 1992 and 2006, Mr. Mulligan had been found guilty of theft.

Ms. Mulligan testified that in August 2009, because she was pregnant, she resigned her teaching position and moved with her three children to live with Mr. Corbett in Waynesburg, Pennsylvania.  Mr. Corbett paid for the rent and utilities, but he told Ms. Mulligan that she needed to sign up for food stamps to provide groceries for herself and her children because "it was too hard for him to do it all."

On September 3, 2009, Mr. Corbett became frustrated with Ms. Mulligan's children, and he told her that "he couldn't stand it anymore," and "he wanted out."  Ms. Mulligan told him that she would go away for the weekend to "give him

---

3.  Mr. Mulligan did not concede that he was not the father, testifying that he and Ms. Mulligan had sex in April 2009.  He acknowledged, however, that he had a vasectomy in 2005.  He also acknowledged that he signed a document on April 20, 2009, stating that he and Ms. Mulligan were living separate and apart, and had not cohabitated since April 4, 2008, but he interpreted that to mean that they had not lived together during that time, not that they had not engaged in sexual relations.

some time to think about it." On Friday, September 4, 2009, Mr. Corbett sent Ms. Mulligan a text message asking her to move out of his house by the following Monday.[4]

Ms. Mulligan, who was pregnant and had three children, was unable to move all her things out in that short time frame. Mr. Corbett subsequently left her a phone message that if she did not get her things out of the house, he would put them out on the curb.

Ms. Mulligan subsequently moved out of Mr. Corbett's home and back to Maryland. She testified that she sent Mr. Corbett an update on the baby after every doctor's appointment.[5] Mr. Corbett had asked if he could be present when

---

4. A copy of the text message was admitted into evidence. It stated:

   As a matter of fact [you] need [to] have that paper [for] me [to] sign when [you] get back because [you] refuse [to] supervise or control them and [I] cannot afford [for] them [to] inflict anymore damage on that house. [Y]ou need to be out first of the week.

5. A copy of one e-mail exchange was admitted into evidence. On Thursday, October 15, 2009, at 8:09 p.m., Ms. Mulligan sent Mr. Corbett the following e-mail:

   The baby weighs apx. 1 lb. 8 oz., which is right on track. All the measurements are good. We are all getting flu shots tomorrow. I am to check back next week about the availability of the H1N1 vaccine.

   An e-mail from Mr. Corbett sent two weeks later on Thursday, October 29, 2009, at 10:21 p.m., was also introduced into evidence:

   What does it take to find out about my daughter? ? ? Everyone I tell about how you are handling this is appa[l]led. They cannot believe that you won't communicate with me at all. It is amazing Amy that you think you are right about this in any way, shape or form. You're not! Amy I promise that you don't have any more contempt for me than I do for you. None the less [sic] [I] have tried to be civil about this, where as you have been a total you know what!! You know that[']s trust. I know absolutely nothing, although you already know that and I'm sure you are just loving keeping me in the dark about Grace. This is you getting at me. I did nothing wrong and should not have to suffer not knowing about my child!! TOTALLY UNFAIR AMY!!! I don't know anything about your plans with her. I don't know whether you're living with the dirtbag, thief, self-admitted pedofile husband of yours or not. [A]nd if you are, are you going to try to say Grace is his? That better not be the case!! This is a last ditch effort to try to get you to be def[ ]cent and sane about OUR OUR OUR [d]aughter. It's getting to be almost time for her to get here, you['re] forcing my hand here Amy, I have my parent[']s full financial

Gracelyn was born, but Ms. Mulligan testified that would not be possible because it would be "too hard" given the nature of their relationship. She testified that Mr. Corbett was "antagonistic," and he had harassed her, prompting her to file harassment charges against him.

Ms. Mulligan called Mr. Corbett on the night Gracelyn was born. Mr. Corbett was "very angry" and told her that she was "very inconsiderate for not . . . letting him be there." When he asked who was present when Gracelyn was born, she responded that Mr. Mulligan had been there. Mr. Corbett was upset and appalled. Mr. Corbett was also upset because visiting hours were almost over, and he would not be able to see Gracelyn until the next day.

The next morning, Ms. Mulligan called Mr. Corbett to remind him to bring his identification so that he would be able to sign the Affidavit of Parentage for the birth certificate as Gracelyn's father. Mr. Corbett stated that he would talk about that when he got there. When he arrived at the hospital, he refused to sign the affidavit, stating that he would have "to support [Gracelyn] for 18 years of her life." He became "very ugly," stating that her last name was not Mulligan, and bringing up again that she did not allow him to be there for the child's birth. The argument became heated, and Ms. Mulligan threatened to call security. Mr. Corbett left and did not contact her again or give her any money or anything else to provide for the baby.

Ms. Mulligan testified that, when the baby was born, she was covered under Mr. Mulligan's health insurance. She testified that Mr. Mulligan helped to take care of Gracelyn, changing her, bathing her, and feeding her. Ms. Mulligan wanted to marry Mr. Mulligan again, but they could not afford to get married.

---

backing. If you don't start communicating with me about OUR daughter, the next correspondence you get from me, will be on the letterhead of a powerful Maryland law[ ]firm. I'm done playing games! I would never do this to you if I had the baby!!!!!!!!!!! [T]hat's funny and you're the religious one!!!

Ms. Mulligan also testified about Mr. Corbett's interactions with her other children. Mr. Corbett never played with the children while she was living with him, he refused to watch television with them, and he was "very, very harsh with them."

On cross-examination, Mr. Corbett's attorney confronted Ms. Mulligan with the complaint for absolute divorce that she filed on May 6, 2009. He asked whether she swore in the complaint that she had lived separate and apart from Mr. Mulligan, without engaging in sexual intercourse, since April 4, 2008. After her counsel objected, Ms. Mulligan asserted her Fifth Amendment right against self-incrimination.

Ms. Mulligan testified that Mr. Mulligan was Gracelyn's legal father, he acted as her father, and he was the person that Gracelyn knew as her father. Although she was not sure that Mr. Corbett was Gracelyn's biological father, she believed that he was. Nonetheless, she refused to subject Gracelyn to DNA or blood testing as requested by Mr. Corbett to prove paternity because she did not believe that it was in Gracelyn's best interests. She stated that her other children felt threatened by Mr. Corbett, that Mr. Corbett did not know how to respond to a child, and that given the angry and tense relationship she had with Mr. Corbett, she did not think that they could share responsibility for Gracelyn.

Mr. Donald King, Ms. Mulligan's 79-year-old father, testified regarding the efforts he made to assist his pregnant daughter move out of Mr. Corbett's home in the 72-hour time frame that Mr. Corbett imposed. He also described Gracelyn's home environment, stating that she and Mr. Mulligan had "bonded beautifully."

Mr. Corbett testified next. He had known Ms. Mulligan "pretty much all [his] life," and they began dating in March 2009. They were trying to have a baby. When Ms. Mulligan learned she was pregnant, Mr. Corbett "was thrilled."

In August 2009, Mr. Corbett and his cousin loaded Ms. Mulligan's belongings in a truck to move her and her children into his home in Pennsylvania. While Ms. Mulligan and her children lived with Mr. Corbett, he paid rent, utilities, Ms.

Mulligan's car payment, and general upkeep of the house. Mr. Corbett disagreed with the manner in which Ms. Mulligan disciplined her children. He acknowledged that he had threatened to strike them. He explained that the children put holes in the walls of the house, and he eventually asked that she leave. When Ms. Mulligan moved out of the house, Mr. Corbett contributed $140 toward the cost of the moving truck and gas.

Mr. Corbett testified that he experienced a great deal of frustration when he attempted to get information about Ms. Mulligan's pregnancy after she moved out of his home. Specifically, he noted that he was unable to get information regarding her birthing plans or confirmation that Gracelyn would be taking his last name. He denied harassing, threatening, or cursing at Ms. Mulligan. In response to Ms. Mulligan's testimony regarding his inability to interact with children, Mr. Corbett testified that he had excellent relationships with his nieces and nephews.

Regarding his visit to Ms. Mulligan and Gracelyn in the hospital, Mr. Corbett testified that he had been frustrated that he was not able to visit Gracelyn until the day after she was born. He stated, however, that he was comfortable holding her, and that he loved her. Both of his parents had accompanied him to the visit, and they took turns holding her and taking pictures and videos.

Mr. Corbett stated that he did not sign the Affidavit of Paternity because he "needed to be 100 percent sure." He explained that he "wasn't being treated as the father. I wasn't there for the birth. The child was not named after me.... I felt that I wasn't going to risk 18 years of my life [on] a child that I'm not being treated as a father." Mr. Corbett acknowledged that he was not "100 percent" sure that he was Gracelyn's father, and he had requested DNA testing at the hospital. Ms. Mulligan refused because it was too expensive. Mr. Corbett denied threatening Ms. Mulligan at the hospital, and he stated that he was holding Gracelyn when Ms. Mulligan threatened to call security. His attorney had

advised him to initiate discussions regarding visitation the week after Gracelyn was born, but he did not do so because he was afraid that Ms. Mulligan would bring more charges against him.

At the conclusion of the testimony, counsel for Mr. Corbett argued that, if the child was born out of wedlock, the court, pursuant to F.L. § 5–1029, had "no authority to do anything other than order DNA tests." Counsel further argued that, even if the court were not required to order DNA testing, it was in Gracelyn's best interests that the test be ordered. He asserted that Gracelyn's current home was not stable, stating that Mr. and Ms. Mulligan had a "history of breaking up" and financial problems. He explained that Gracelyn would benefit from Mr. Corbett's child support payments, as well as knowing the identity of her biological father for medical reasons. Counsel argued that Gracelyn was not yet old enough to have forged strong bonds with her siblings or Mr. Mulligan, and there was no risk of emotional harm to Gracelyn by proving that Mr. Corbett was her biological father.

Counsel for Ms. Mulligan argued that the Estates and Trusts Article makes clear that Mr. Mulligan is the legal father of Gracelyn. He asserted that Mr. Mulligan signed an Affidavit of Paternity acknowledging Gracelyn as his child. Because Gracelyn had a legal father, the court was not required to order paternity tests, but rather, the court needed to make a decision based on the best interests of the child. Counsel argued that it was in Gracelyn's best interests not to have a paternity test and potentially disturb the strong bond that Gracelyn had with Mr. Mulligan, particularly given Mr. Corbett's prior acts.

The court issued its decision from the bench. The court ruled that paternity testing was mandated only where paternity was void. In this case, paternity was not void because, pursuant to E.T. § 1–206, there was a rebuttable presumption that Gracelyn was the legitimate child of Mr. Mulligan because she was conceived during the Mulligan's marriage. The court stated that the Family Law Article was not "intended to

disestablish [ ] paternity where paternity is statutorily established." The court determined that, pursuant to E.T. § 1–206, analysis of the best interests of the child was the standard to determine whether to order genetic testing.

Applying the best interests standard, the court found that it was not in Gracelyn's best interests to have a paternity test, noting that she was in an intact family that provided stability, "she [wa]s well cared for, well loved, [and] well nourished," both physically and emotionally. Mr. Corbett, on the other hand, had a very limited relationship with Gracelyn, he had kicked Ms. Mulligan out of his home while she was pregnant, and he had a weak relationship with Ms. Mulligan's other children, whom he threatened with a belt. Moreover, he had not paid for prenatal visits or any of Gracelyn's needs after her birth. The judge stated that, after observing Mr. Corbett's demeanor and testimony in court, she believed that the proceedings were "a control thing."

On May 26, 2010, the court issued its order, denying Mr. Corbett's request for paternity testing and ordering that Mr. Mulligan was the legal father of Gracelyn. This timely appeal followed.

## STANDARD OF REVIEW

The standard of appellate review for an action tried without a jury is set forth in Maryland Rule 8–131(c), which provides:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

" 'The appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party.' " *Friedman v. Hannan*, 412 Md. 328, 335, 987 A.2d 60 (2010) (quoting *Ryan v. Thurston*, 276 Md. 390, 392, 347 A.2d 834 (1975)). " 'If there is any competent evidence to support the

factual findings below, those findings cannot be held to be clearly erroneous.' " *Id.* at 335–36, 987 A.2d 60 (quoting *Solomon v. Solomon*, 383 Md. 176, 202, 857 A.2d 1109 (2004)). The deference given to the trial court's factual findings, however, does not apply to legal conclusions. *Clancy v. King*, 405 Md. 541, 554, 954 A.2d 1092 (2008). Instead, we " 'must determine whether the lower court's conclusions are legally correct.' " *White v. Pines Community Improvement Ass'n, Inc.*, 403 Md. 13, 31, 939 A.2d 165 (2008) (quoting *YIVO Institute for Jewish Research v. Zaleski*, 386 Md. 654, 662, 874 A.2d 411 (2005)).

## DISCUSSION

■ Mr. Corbett's first, and ultimately dispositive, contention is that the trial court erred in denying his request for DNA testing to determine paternity of Gracelyn. He argues that the court was required to order a paternity test upon his request, and it erred in considering the best interests of Gracelyn in determining whether to order a paternity test. He further argues that, even if the best interests of the child was the proper analysis for determining whether to order a paternity test, the court "erred in determining that he had not demonstrated, by a preponderance of the evidence, that it was in Gracelyn's best interests to have genetic/blood testing to determine the identity of her biological father." Mr. Corbett asserts that it is in Gracelyn's best interests to "determine for certain who her biological father really is," he "is willing and able to provide financial support" for her, and he has constantly voiced his desire to build a relationship with her.

Ms. Mulligan contends that, because Gracelyn was conceived during the Mulligans' marriage, Mr. Mulligan is presumed to be Gracelyn's father. She argues that, although blood testing is mandatory on request when there is no legal father, if there is a presumed legal father, testing to rebut the presumption of paternity should be ordered only upon a showing of good cause that it is in the child's best interests to conduct such tests. Ms. Mulligan contends that the trial court properly applied the best interests test and determined that it was not in Gracelyn's best interests for a paternity test to be

ordered. She asserts that Mr. Mulligan is better suited to be a father to Gracelyn, noting that he provided health insurance during her pregnancy and for Gracelyn's birth, attended prenatal doctor's appointments, and "provided child support for his other children when the family was separated." In contrast, Mr. Corbett did not pay for Ms. Mulligan's prenatal visits or Gracelyn's health care, he did not attend any prenatal doctor's visits, and he did not even support Ms. Mulligan while they were living together, instead asking her to apply for food stamps. Moreover, Ms. Mulligan asserts that Mr. Corbett was unable to bond with her other children.

■ The first step of the analysis requires us to determine which of two statutory provisions applies to this case. There are "two viable methods or proceedings for establishing paternity," one found in the Estates and Trusts Article and the other in Family Law Article. *Kamp v. Dep't of Human Servs.*, 410 Md. 645, 655, 980 A.2d 448 (2009). The question regarding which of these two statutory schemes is applicable in this case is a legal determination, which we review *de novo*. *Evans v. Wilson*, 382 Md. 614, 623, 856 A.2d 679 (2004).

Mr. Corbett argues that, because Gracelyn was born after the Mulligans were divorced, she was born out of wedlock, and therefore, the applicable paternity provisions are those in the Family Law Article, specifically F.L. § 5–1002 and F.L. § 5–1029(b). Section 5–1002 sets forth the purpose of the paternity provisions in the Family Law Article as follows:

(a) *In general.*—The General Assembly finds that:

(1) this State has a duty to improve the deprived social and economic status of children born out of wedlock; and

(2) the policies and procedures in this subtitle are socially necessary and desirable.

(b) *Purpose.*—The purpose of this subtitle is:

(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock.

(c) *Establishment of paternity.*—Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child.

■ Section 5–1029(b) applies to requests for paternity tests in an action governed by the Family Law Article. It provides:

*In general.*—On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.

Pursuant to this statute, a trial court has no discretion regarding whether to order a blood test; genetic testing is mandatory if requested by a party. *Evans,* 382 Md. at 626–27, 856 A.2d 679; *Langston v. Riffe,* 359 Md. 396, 428–29, 754 A.2d 389 (2000).

Ms. Mulligan maintains that the paternity provisions in the Estates and Trusts Article are applicable here. Specifically, she relies on E.T. § 1–206(a), which sets forth a presumption of legitimacy for a child born or conceived during a marriage. Section 1–206(a) provides: "A child born or conceived during a marriage is presumed to be the legitimate child of both spouses." Ms. Mulligan argues that, because Gracelyn was conceived while she was married to Mr. Mulligan, he is the presumed father, and it is only when "there is no presumptive father that the Family Law scheme is applicable." [6]

---

**6.** Mr. Mulligan is the presumptive father pursuant to the Family Law Article as well. *See* F.L. § 5–1027(c) ("[t]here is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception").

██ In the Estates and Trusts Article, unlike F.L. § 5–1029(b), there is no provision for mandatory genetic testing. Rather, the Court of Appeals has held that a motion for genetic testing under the Estates and Trusts Article is comparable to a request for a physical examination under Maryland Rule 2–423, "which the court has discretion to grant for good cause." *Evans,* 382 Md. at 628, 856 A.2d 679.[7] In determining whether there is good cause to order genetic testing to determine paternity, the court " 'must' consider the husband and wife's privacy interest along with petitioner's interest in a relationship with the child," and it "may consider 'the best interests of the child.' " *Id.* (quoting *Turner v. Whisted,* 327 Md. 106, 114, 116, 607 A.2d 935 (1992)).

The issue of which statutory scheme is applicable here is critical to assess the propriety of the court's order below. If, as Ms. Mulligan argues, the Estates and Trusts Article applies, then the circuit court properly considered the best interests of Gracelyn in determining whether to order the requested genetic testing to rebut the presumption that Mr. Mulligan was the father. If, however, the Family Law Article provisions apply, then the court was required to order testing without a consideration of Gracelyn's best interests.

The Maryland appellate courts have addressed the choice of statutory provisions on several occasions, primarily in the context of a child born during a marriage. In *Turner,* 327 Md. at 109–10, 607 A.2d 935, two men claimed to be the father of a child: (1) Turner, who had a sexual relationship with the mother, who subsequently became pregnant; and (2) the man she married before she gave birth. After the child's mother

---

7. Md. Rule 2–423 provides, in pertinent part, as follows:

    When the mental or physical condition or characteristic of a party or of a person in the custody or under the legal control of a party is in controversy, the court may order the party to submit to a mental or physical examination by a suitably licensed or certified examiner or to produce for examination the person in the custody or under the legal control of the party. The order may be entered only on motion for good cause shown and upon notice to the person to be examined and to all parties. . . .

and her husband separated, and Turner and the mother reconciled and then broke up again, Turner filed a complaint for visitation and a motion for a blood test to establish his paternity. *Id.* at 110, 607 A.2d 935. The Court of Appeals held that the Estates and Trust Article was the appropriate statutory provision to establish paternity when a child was born during a marriage. *Id.* at 113, 607 A.2d 935. The Court explained that, "where a child is presumed 'legitimate' and 'where two men each acknowledge paternity' of that child, the procedure for considering the issue of paternity under the Estates and Trusts Article is preferable because it presents the 'more satisfactory' and 'less traumatic' means of establishing paternity." *Evans,* 382 Md. at 628, 856 A.2d 679 (quoting *Turner,* 327 Md. at 113, 607 A.2d 935). The Court referenced the trial court's discretion under the Estates and Trusts Article, allowing the court to weigh the interests of the parties and the best interests of the child in determining whether to grant or deny genetic testing. *Turner,* 327 Md. at 116, 607 A.2d 935.

This Court revisited the issue in *Stubbs v. Colandrea,* 154 Md.App. 673, 675, 841 A.2d 361 (2004), where Mr. Stubbs sought blood tests to establish paternity and obtain visitation of a child born to, and conceived by, Ms. Colandrea while she was married to Mr. Colandrea. The Court noted that the pertinent facts were similar to *Turner, i.e.,* a man attempting to obtain a blood test to establish paternity of a child born during a marriage of the mother and husband, which supported the trial court's action in assessing whether ordering the tests was in the child's best interest. *Id.* at 679–80, 841 A.2d 361.

The Court noted, however, that subsequent to *Turner,* the General Assembly had enacted changes to the Family Law Article. *Id.* at 680, 841 A.2d 361. In particular, the Court addressed the impact of the addition of F.L. § 5–1002(c), which states: "Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child." *Id.*

Writing for this Court, Judge Rodowsky engaged in a thorough analysis of the legislative history of F.L. § 5–1002(c), noting that the purpose of the statute was to " 'clarify[ ] that a putative father may file a paternity action.' " *Id.* at 683, 841 A.2d 361 (quoting 1997 Md. Laws, Chap. 609 at 3333). Judge Rodowsky determined that the General Assembly enacted § 5–1002(c) in response to federal legislation that required states, as a condition to continuing to receive federal assistance, to have laws in effect regarding paternity proceedings, including genetic testing, to increase the effectiveness of the child support enforcement programs. *Id.* at 687, 841 A.2d 361. The Court concluded that "the federal impetus for Section 5–1002(c) was aimed at providing 'fathers of children born out of wedlock' an avenue for establishing their paternity for the purpose of 'honoring their support obligations.' " *Evans,* 382 Md. at 635, 856 A.2d 679 (quoting *Stubbs,* 154 Md.App. at 688, 841 A.2d 361).

The Court held, however, that F.L. § 5–1002(c) applied only to a "putative father," which is defined as "the alleged biological father of a child born out of wedlock." *Stubbs,* 154 Md.App. at 688, 841 A.2d 361 (quoting BLACK'S LAW DICTIONARY 623 (7th ed.1999)). Because the child in that case was not born out of wedlock, Stubbs was not a putative father covered by the statute. *Id.* Noting that the child was supported by her mother and presumed father, the Court concluded:

> Nothing in the text of FL § 5–1002(c), or in its Maryland or federal legislative histories, indicates that the General Assembly intended to alter the *Turner v. Whisted* test for determining whether a blood test should be ordered under the circumstances presented here, or that the Federal Government intended to require, under the circumstances presented here, a mandatory blood test similar to that provided by FL § 5–1029.

*Id.*

The Court of Appeals echoed this analysis in *Evans,* 382 Md. at 635–36, 856 A.2d 679. In that case, Evans claimed to

be the biological father of a child conceived and born when the child's mother was married to another man. *Id.* at 617–18, 856 A.2d 679. Evans filed a complaint to determine paternity, requesting that the court order the parties to submit to genetic testing. *Id.* at 621, 856 A.2d 679. The circuit court denied the request, finding that the mother's husband was the presumed father because the child was born while the mother was married to him, and that Evans had to demonstrate that a paternity test would be in the best interests of the child, which Evans did not do. *Id.* The Court addressed Evans' argument that the 1997 addition of § 5–1002(c) expanded a putative father's rights, giving a putative father an absolute right to demand genetic testing. *Id.* at 629, 856 A.2d 679. The Court construed § 5–1002(c) as "prohibit[ing] any construction of the statute that would limit the right of a 'putative father' to file an action to 'establish paternity of a child.'" *Id.* at 633, 856 A.2d 679 (quoting *Stubbs,* 154 Md.App. at 680, 841 A.2d 361). The Court held, however, consistent with the holding in *Stubbs,* that the General Assembly enacted F.L. § 5–1002(c) "to ensure the protection and support of children *born out of wedlock,*" and because Evans was suing to establish paternity of a child born during a marriage, the statute did not apply to him. *Id.* at 635, 856 A.2d 679.

The Court stated:

[C]onsidering the "best interests" standard represents the best policy for evaluating when a child born during a marriage can be ordered to undergo paternity testing. If the mandatory blood or genetic testing under Section 5–1029 could be invoked every time an individual seeks to establish paternity of a child born during a marriage, the consequences to intact families could be devastating. Without regard to the child's best interests, courts would be forced to order genetic tests of every child whose paternity is merely questioned. This would be the case even if the child is well cared for and could assert that he or she does not want his or her life to be disturbed. We do not believe that, in enacting the "Paternity Proceedings" of the Family Law Article, the legislature intended such an effect.

*Id.* at 636, 856 A.2d 679. The Court held that Turner "remain[ed] the controlling precedent for cases such as this, where two men (one the husband of the mother and the other a stranger to the marriage) acknowledge the paternity of a child born during a marriage." *Id.*

In two more recent cases, this Court and the Court of Appeals have applied the best interests of the child analysis to determine whether genetic testing should be ordered for a child born during a marriage. In both *Kamp*, 410 Md. at 665–66, 980 A.2d 448, and *Ashley v. Mattingly*, 176 Md.App. 38, 39–40, 55, 932 A.2d 757 (2007), the issue was whether genetic testing should be ordered upon the request of the father, after divorce, for the purpose of avoiding child support. In both cases, the trial court determined that, because the children were born during the parents' marriage, the best interests analysis pursuant to E.T. § 1–206(a) applied. *Kamp*, 410 Md. at 665–66, 980 A.2d 448; *Ashley*, 176 Md.App. at 39–40, 55, 932 A.2d 757.[8]

The present case is distinguishable from the above cases because here the child was not born during a marriage.[9] Gracelyn was conceived while Mr. and Ms. Mulligan were

---

**8.** In each case, the Court remanded to the circuit court for application of that analysis, with the observation that belated efforts to disestablish paternity and declare a child illegitimate rarely would be in the child's best interests. *Kamp v. Dep't of Human Servs.*, 410 Md. 645, 671, 980 A.2d 448 (2009); *Ashley v. Mattingly*, 176 Md.App. 38, 41–42, 932 A.2d 757 (2007).

**9.** The Court of Appeals did apply a best interests analysis in one case regarding genetic testing involving a child born out of wedlock. *See Monroe v. Monroe*, 329 Md. 758, 773, 621 A.2d 898 (1993). That case, however, is distinguishable from the present case. Initially, the Court in *Monroe* noted that the blood tests were not sought in an action to establish paternity pursuant to the Family Law Article or the Estates and Trusts Article, but rather, genetic testing was "requested in the context of a child custody dispute." *Id.* at 766, 621 A.2d 898. Moreover, that case was decided prior to the General Assembly enacting F.L. § 5–1002(c), and it was the mother, not the putative father, who was seeking the blood test, and her purpose was to disestablish a man's paternity, with no intent to establish someone else as the father. *Id.* at 770–71, 621 A.2d 898.

married, albeit separated, but she was born after they were divorced.

There certainly are policy reasons to support the trial court's application of the best interests analysis to a child born out of wedlock under the circumstances of this case. A purpose of the Family Law Article paternity provisions is "to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock." F.L. § 5–1002(b)(1). Here, Gracelyn is being provided with support and care by Mr. Mulligan, who is presumed to be her father. *See* E.T. § 1–206(a) ("A child born or conceived during a marriage is presumed to be the legitimate child of both spouses"); F.L. § 5–1027(c)(1) ("There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."). Thus, with the exception of the fact that Gracelyn was born out of wedlock, her situation is similar to that described in *Turner*; Gracelyn "is presumed legitimate" and "two men each acknowledge paternity." *Turner*, 327 Md. at 113, 116, 607 A.2d 935. Under these circumstances, an argument can be made that the best interests analysis under the Estates and Trusts Article, which permits a balancing of the competing interests, is the appropriate way to establish paternity.

The General Assembly, however, has provided that a "putative father" of a child born out of wedlock has the right to bring a paternity action under the Family Law Article. *See* F.L. § 5–1002(c) ("Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child."). Indeed, the Court of Appeals has explained that "Section 5–1002(c) was aimed at providing 'fathers of children born out of wedlock' an avenue for establishing their paternity for the purpose of 'honoring their support obligations.' " *Evans*, 382 Md. at 635 n. 6, 856 A.2d 679 (quoting *Stubbs*, 154 Md.App. at 688, 841 A.2d 361). It stated that § 5–1002(c) "prohibits any construction of the statute that would limit the right of a 'putative father' to file

an action to 'establish paternity of a child.' " *Id.* at 633, 856 A.2d 679 (quoting *Stubbs,* 154 Md.App. at 680, 841 A.2d 361). More recently, the Court has stated that "[w]hen the child is 'born out of wedlock,' " the Family Law paternity provisions apply. *Kamp,* 410 Md. at 656, 980 A.2d 448.

Thus, because Gracelyn was born out of wedlock, the Family Law Article was the proper statutory provision to address Mr. Corbett's request for genetic testing to determine Gracelyn's paternity. Pursuant to F.L. § 5–1029, which provides that the court "shall order" genetic tests upon a motion by a party, the court was required to order genetic testing after Mr. Corbett requested it. If the results establish that Mr. Corbett is Gracelyn's father, the court should consider Gracelyn's best interests with respect to Mr. Corbett's request for visitation. *See Meyr v. Meyr,* 195 Md.App. 524, 545, 7 A.3d 125 (2010) ("Maryland law charges trial judges with the authority to make decisions regarding visitation upon a determination of the children's best interest.").

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

